UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---
:
BEVERLY FORDE,                       :
                                     :
            Petitioner,              :          CIVIL NO.
                                     :
       v.                            :
                                     :          3:03 CV 1424 (EBB)
DONNA ZICKEFOOSE, Warden,            :
FCI Danbury_____       :
                                     :
            Respondent.              :
---

---

**RULING ON RESPONDENT'S CONVERTED MOTION FOR SUMMARY JUDGMENT**

The Petitioner, Beverly Forde ("Petitioner") brings this action against Donna Zickefoose ("Respondent"), as a Petition for Writ of Habeas Corpus under 28 U.S.C. §§ 2241 and 2243, alleging that she is being denied her freedom of religious expression in violation of the First and Fourth Amendments to the United States Constitution and the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb-1.

Currently pending before the Court is Respondent's converted motion for summary judgment [Doc. No. 30]. For the following reasons, Respondent's converted motion for summary judgment is GRANTED in part and DENIED in part.


     **A.  Factual Background**

The court sets forth only those facts deemed necessary to an

understanding of the issues raised in, and decision rendered on, this motion for summary judgment.  The following factual summary is based on Respondent's Local Rule 56(a)1 Statement of Material Facts ("Resp't's 56(a)1 Statement"), Petitioner's Local Rule 56(a)2 Statement of Material Facts ("Pet'r's 56(a)2 Statement"), and accompanying affidavits, depositions and exhibits, to the extent that they are admissible evidence.  For the purposes of the instant motion for summary judgment, the court accepts the facts undisputed by the parties as true and resolves disputed facts in favor of the non-moving Petitioner, where there is evidence to support her allegations.

On February 19, 1993, Petitioner was sentenced to life in prison by the United States District Court for the Eastern District of Virginia after being found guilty of Conspiracy to Possess with Intent to Distribute 50 Grams or More of "Crack" (Schedule II), 21 U.S.C. § 846, and Continuing Criminal Enterprise, 21 U.S.C. § 848. Resp't's 56(a)(1) Statement ¶ 1 (admitted).  Petitioner has been incarcerated at the Federal Correctional Institution, Danbury, Connecticut ("FCI Danbury") since April 3, 1996. Id. (admitted). FCI Danbury is a federal prison for women in Connecticut, with 1,500 prisoners.  Raftery Dep. 19:23 (Pet'r's Ex. G).  On February 27, 1998, Petitioner was resentenced by the Eastern District of Virginia to a 360-month term of incarceration to be followed by a 5-year term of supervised release.  Resp't's 56(a)(1) Statement ¶

2

1 (admitted).  Petitioner could be released October 22, 2018 if she is given all the good conduct time available to her under 18 U.S.C. § 3624(b).  Id. (admitted).

Petitioner converted to Islam in 1993.  Forde Dep. 28:14 (Pet'r's Ex. E).  As part of her religious faith, she believes that she must not be touched by any man outside her immediate family (*mahram*).  Forde Aff. ¶ 24 (Resp't's Ex. C).  This belief does not extend to emergency situations.  Id.

FCI Danbury follows a random search policy of the Bureau of Prisons ("BOP") that includes pat-down searches of prisoners by male guards.  See Bureau of Prisons Program Statement ¶ 125 (Aug. 17, 1998)(Resp't's Ex. 1Q).  Currently the prison staff consists of approximately sixty percent male guards.  Cantor Dep. 34:15 (Pet'r's Ex. K).  Most of the pat-down searches occur at times when prisoners could have had access to contraband items, such as meals or time with outside visitors.  Id. at 44:4-7.  FCI Danbury will exempt prisoners from cross-gender pat-down searches for mental health reasons.  Zickefoose Letter (Feb. 8, 2008)(Pet'r's Ex. P).

Petitioner believes that no man outside her *mahram* should see her uncovered hair and neck.  Forde Aff. ¶ 15.  She covers these parts of her body with a traditional garment worn by Muslim women in many parts of the world (*hijab*).  Pet'r's 56(a)(2) Statement 10; Emon Statement 4 (Pet'r's Ex. V).  FCI Danbury allows Petitioner to wear the *hijab*, and she has worn one since 1996.  Forde Dep. 29:11-

3

12.

The Department of Corrections has a policy requiring identification photographs of all inmates. Forde Aff. ¶ 18. On November 1, 2004, Petitioner's photo was taken without her *hijab*. Forde Dep. 59:25. Identification photos are used on ID cards carried by inmates, which are themselves used to purchase food and other items. Petitioner carries an ID card with a picture of her without her *hijab* and shows it to prison officials on a weekly basis. Forde Aff. ¶ 19. Additionally, copies of identification photos are kept in a security office and used for flyers in case of escape by an inmate. Pummill Dep. 143:12-14 (Pet'r's Ex. A).

Petitioner believes that it is her obligation as a Muslim to attend weekly prayer on Fridays (*jum'ah*), where she should hear a sermon (*khutbah*). Forde Aff. ¶¶ 3-4. She further believes that the *khutbah* should be given by a male imam who is over eighteen years of age and has training in the tenets of Islam. Id.

Approximately 70 of the prisoners at FCI Danbury identify as Muslims, and 15-20 of these attend *jum'ah*. Dep. Raftery 67:3-8. FCI Danbury currently has two full time chaplains, one Catholic nun and one Pentecostal minister, who are charged with meeting the religious needs of the prisoners. Resp't's Reply Mem. 2-3. Since at least 1998 there has been no full-time Muslim imam at FCI Danbury, and prison officials have tried to secure the services of an imam for several years. Abdulrazak Aff. ¶ 21 (Pet'r's Ex. D);

4

Raftery Dep. 82:3-86:6.   An imam has come for certain feast days surrounding the holy month of Ramadan.   Raftery Decl. ¶ 6 (Resp't's Ex. Unnumbered).   Additionally, two female Muslim volunteers come to the prison to lead prayer and other religious services. Raftery Decl. ¶ 8.   Petitioner alleges that these volunteers do not come on a weekly basis or are often turned away when they do come. Abdulrazak Aff. ¶¶ 12, 20.   In addition to the volunteers, the prison has a library with a number of video tapes with recordings of *khutbahs*.   Raftery Decl. ¶ 8.   Petitioner alleges that these are at least 17 years old and therefore do not deal with contemporary issues as the weekly sermons should.   Forde Aff. ¶ 13.

On October 7, 2004, as Petitioner was leaving the dining hall she was informed by four male guards that she was going to be patted down.   Federal Bureau of Prisons Incident Report (Oct. 7, 2004)(Pet'r's Ex. S).   Petitioner informed the guards that she was a Muslim and requested that a female guard conduct the search.   Id. Subsequently, Petitioner was strip-searched by a female guard in another room and placed in the Segregated Housing Unit (SHU) for a period of seven days.   Id.   Respondent claims that Petitioner was placed in the SHU for refusing to follow an order.   See Resp't's 56(a)1 Statement ¶ 11.   Petitioner claims the officials retaliated against her for requesting that a female guard search her.   Pet'r's 56(a)2 Statement ¶ 11.

**Procedural History**

5

On November 26, 2002, Petitioner filed a Request for Administrative Remedy at FCI Danbury, requesting the services of an imam and that FCI Danbury's Pastoral Care services fill special purchase orders for religious items such as prayer rugs, prayer oils and *hijabs*. Resp't's 56(a)1 Statement ¶ 2 (admitted). Kuma Deboo, who was warden of FCI Danbury at the time, partially granted Petitioner's request, stating that FCI Danbury was searching for a contract imam to assist with *jum'ah* prayer on Fridays and that religious items could be purchased through the Chapel Catalogue of Interfaith Religious Items. Id. (admitted). Petitioner appealed Warden Deboo's decision to the Northeast Regional Director of the BOP and then the National Inmate Appeals Administrator, both of whom denied the appeal. Id. at ¶¶ 3-4 (admitted).

Eighteen months later, on November 11, 2004, Petitioner filed another Request for Administrative Remedy, challenging FCI Danbury's policy requiring inmates to remove any head covering for identification card photographs and requesting an exemption from the cross-gender pat-down search policy. Id. at ¶ 6 (admitted). William Willingham, who was warden at the time, denied the request on December 3, 2004, citing program statements concerning pat-down searches and identification photographs. Id. (dmitted). Petitioner subsequently appealed the decision to the Northeast Regional Director and National Inmate Appeals Administrator, who both denied the appeal for the same reasons as Warden Willingham. Id. at ¶¶ 7-

6

8 (admitted).

Petitioner filed a *pro se* action against Willingham on August 21, 2003 [Doc. No. 1].  Respondent moved to dismiss on September 23, 2004 [Doc. No. 13].  The court denied Respondent's motion and construed Petitioner's action as a petition for a writ of habeas corpus under 28 U.S.C. § 2241 on June 22, 2005 [Doc. No. 21].  Petitioner filed a petition for a writ of habeas corpus on July 22, 2005 [Doc. No. 25], and Respondent moved to dismiss the petition on October 7, 2005 [Doc. No. 30].  The court converted Respondent's motion to dismiss into a motion for summary judgment on April 26, 2006 [Doc. No. 48].  Petitioner was granted leave to conduct limited discover on October 13, 2006 [Doc. No. 54].

###      B.   Standard of Review

The standard for summary judgment is well established.  A moving party is entitled to summary judgment if it demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  An issue of fact is "material" if it "might affect the outcome of the suit under the governing law", while an issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Konikoff v. Prudential Ins. Co. Of Am., 234 F.3d 92, 97 (2d Cir. 2000).  Upon

motion, and following adequate time for discovery, Rule 56(c) requires that summary judgment be entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). This showing may be made by "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any." FED. R. CIV. P. 56(c). The evidence of the non-moving party is to be believed, Anderson, 477 U.S. at 255, and "the inference to be drawn from the underlying facts...must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). However, the non-movant may not rest upon the mere allegations or denials of his pleading, see FED. R. CIV. P. 56(e), and "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Instead, the non-moving party "must offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).

**C.  Discussion**

**RFRA Claim**

Petitioner brings a claim for relief under RFRA based on

8

policies of FCI Danbury that subject her to non-emergency pat-down searches by male guards and compel her to use an identification photograph that shows her without her *hijab*, as well as Respondent's failure to provide a qualified imam for weekly *jum'ah* prayer services.  RFRA states, "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability..."  42 U.S.C. § 2000bb-1(a). The government may substantially burden a person's exercise of religion only if "that application of the burden to the person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  <u>Id</u>. at 2000bb-1(b).  Religious exercise "includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A), <u>incorporated by</u> 42 U.S.C. § 2000bb-2(4).[1]

With respect to each of Petitioner's claims, the court must consider whether her religious exercise is substantially burdened by Respondent, and if it is, whether the government has a compelling interest and uses the least restrictive means to further that interest.  The Second Circuit Court of Appeals has ruled that

---

[1]  The court agrees with Petitioner that Respondent has misconstrued the clear definition of religious exercise under RFRA, as modified by the Religious Land Use and Institutionalized Persons Act (RLUIPA).  <u>See</u> <u>id</u>.  Because RFRA incorporates the definition from RLUIPA, there is no need for Petitioner to bring her case under RLUIPA for its definition to apply on this point.

"substantial burden" is a term of art controlled by the Supreme Court's use of the term in earlier First Amendment cases.  See Westchester Day Sch. v. Vill. of Mamaroneck, 504 F.3d 338, 348 (2d Cir. 2007).[2]  A substantial burden exists where the state "puts substantial pressure on an adherent to modify his behavior and to violate his beliefs."  Jolly v. Coughlin, 76 F.3d 468, 477 (2d Cir. 1996)(quoting Thomas v. Rev. Bd. of the Indiana Employment Sec. Div., 450 U.S. 707, 718 (1981)).

The court's scrutiny of whether Petitioner deserves free exercise protection extends only to whether she "sincerely holds a particular belief and whether the belief is religious in nature." Jolly, 76 F.3d at 476. The court is not permitted to ask "whether a particular belief is appropriate or true - however unusual or unfamiliar the belief may be." Id.   Here, as Respondent concedes, Petitioner's Muslim faith is sincerely held.   See Resp't's Mem. 16.  This faith includes her beliefs prohibiting her from being touched in non-emergency situations by a man outside her mahram, prohibiting the exposure of her hair and body to such men and compelling her to attend weekly jum'ah led by an imam. Therefore, the court's analysis will apply RFRA to each of these sincere beliefs respectively.

---

[2]  While Westchester specifically dealt with the RLUIPA, the term "substantial burden" appears in both that statute and RFRA. Given use of the same term of art, there is no reason to treat "substantial burden" any differently under RFRA than RLUIPA.

Non-Emergency Cross-Gender Pat-Down Searches

Respondent concedes that regular cross-gender pat-down searches would place a substantial burden on Petitioner's exercise of her religion, and the court agrees.  See Resp't's Mem. 16. Respondent also claims that Petitioner has been subjected to only a handful of such searches and that FCI Danbury generally accommodates her religion.  See Resp't's Supp. Mem. 21.  However, the court cannot grant summary judgment on this point based on Respondent's contention.  Petitioner has provided evidence that she has been subjected to at least eight cross-gender pat downs since this litigation began.[3]  See Forde Aff. ¶ 33.  Respondent is free to challenge this allegation at trial.

Respondent further argues that FCI Danbury has a compelling governmental interest in conducting pat-down searches of its inmates, and Petitioner concedes that this can be the case.  See Pet'r's Mem. 16.  The court also agrees with Respondent that there is a compelling governmental interest in following Title VII by allowing men to work as guards at FCI Danbury.  See Forts v. Ward 621 F.2d 1210, 1215-16 (2d Cir. 1980).  However, it does not necessarily follow that FCI Danbury's policy is the least restrictive means of furthering that interest.  Petitioner has

_____

[3]  Respondent's own arguments about how difficult it would be to grant an exception support Petitioner's contention that these searches could continue to be a regular occurrence in the future.  See Resp't's Reply Mem. 5-6.

presented the court with evidence that a large majority of prison systems in the United States do not allow non-emergency cross-gender pat-down searches. <u>See</u> National Institute of Corrections, "Cross-Sex Search Practices: Findings from NIC Telephone Research," (Jan. 6, 1999)(Pet'r's Ex. I). Furthermore, Petitioner has produced evidence that cross-gender pat-down searches are not the most effective means of searching inmates. <u>See</u> Expert Report of Miller 8. Finally, Petitioner argues that another inmate has been exempted from cross-gender pat-down searches with no effect on prison security or employment. <u>See</u> Zickefoose Dep. 63:14-15. While the court is sympathetic to Respondent's arguments about Title VII and the employment situation at FCI Danbury, the importance of these governmental interests in narrowly tailoring the search policy should be left to a trier of fact.

Ultimately, Respondent has not met its high burden of demonstrating to the court that FCI Danbury's policy with regard to Petitioner is narrowly tailored. There are material issues of fact as to whether Petitioner's exercise of religion has been substantially burdened and whether FCI Danbury's policy furthers a compelling governmental interest and is the least restrictive means of furthering that interest.

<u>Identification Photograph Without *Hijab*</u>

Petitioner believes that no man outside her *mahram* should see

12

her exposed hair and neck.  Forde Aff. ¶ 15.  She has already had a photograph taken without her *hijab*.  Id. at ¶ 21.  Petitioner has produced evidence that she is required to show this photo on a weekly basis to various correctional officers in FCI Danbury, and many of these officers are men who are outside her *mahram*.  See id. Petitioner claims that displaying this photograph substantially burdens her religious exercise, and Respondent has not given any reason why it would not.  In the absence of contrary evidence, it is reasonable to believe that forcing Petitioner to display the photograph forces her to violate her religious practices for much the same reason that forcing her to remove her *hijab* in front of these men would.

Respondent correctly asserts that the government has a compelling interest in having current photographs of prisoners with uncovered heads for security reasons.  See Resp't's Reply Mem. 6. However, Respondent has not demonstrated that this compelling governmental interest is furthered exclusively by the current identity photograph policy.  Regarding security concerns, Wesley Pummill testified that authorities would need a photograph of Petitioner without her *hijab* for flyers in case she escaped.  See Pummill Dep. 143:12-14.  However, Pummill also testified that he did not believe it would threaten security to have two pictures of Petitioner on file as long as one of them was current and without her *hijab*.  See id.  Thus, it is not necessarily a threat to

13

security for the photo of Petitioner without her *hijab* to be in the "locked office" that Respondent contends.  <u>See</u> Resp't's Reply Mem. 6.   Indeed, were Petitioner to escape, officers at FCI Danbury would likely not have access to her personal identification because it would be on her person.   Nor would they need it because they have another photo on file.   If there is another security reason mandating that Petitioner always carry a photograph of her bare head, Respondent may prove it at trial.   Respondent has not provided evidence of any such security concern thus far.

For these reasons, Respondent has not demonstrated to the court that requiring Petitioner to carry a photograph of her without her *hijab* is the least restrictive means of furthering the interest of prison security.

<u>Failure to Provide Imam</u>

Petitioner has provided evidence both of her sincere Muslim faith and belief that she should attend weekly *jum'ah* led by a qualified, male imam.   Respondent asserts that Petitioner does not need an imam at weekly *jum'ah* in order to practice her religion. <u>See</u> Resp't's Supp. Mem. 16.  However, courts are "particularly ill-suited" for distinguishing between important and unimportant religious beliefs and should not "attempt to resolve intra-faith disputes over religious law and doctrine."  <u>Ford v. McGinnis</u>, 352 F.3d 582, 593 (2d. Cir. 2004).  For this reason, the Second Circuit

has held that the prohibition of a religious practice may be a substantial burden even if the practice is not mandated. See id. (overturning district court's summary judgment ruling against a Muslim inmate who was given a religious feast meal a week after the date prescribed by Muslim law).

Additionally, Respondent has not demonstrated a compelling governmental interest in not providing an imam. Respondent has pointed to legitimate security concerns in finding imams. See Raftery Decl. ¶ 4. However, this is not enough. While there may be a compelling interest in excluding certain imams based on security concerns, Respondent does not argue that there is a governmental interest in excluding all qualified imams. To make such an argument, Respondent would need to show categorically that all qualified imams are security concerns. The court recognizes that FCI Danbury claims to have had trouble securing a qualified imam. See Raftery Decl. ¶ 6. However, the degree of difficulty in finding a qualified imam remains a disputed material fact.[4]

Petitioner has also alleged that FCI Danbury is not even providing the substitutes, such as weekly volunteers and the services of an imam during Ramadan, that Respondent claims. See

---

[4] Petitioner has provided evidence that security may not be the reason at all. Abdullah Antepli, associate director of the Islamic Chaplaincy Program at the Hartford Seminary, testified that Rev. Raferty never contacted him again to ask about potential imams after a preliminary conversation. See Antepli Decl. ¶¶ 6-9 (Pet'r's Ex. AA).

Forde Aff. ¶¶ 8-14; Abdulrazak Aff. ¶¶ 12, 20.  Whether these substitutes are being offered has direct bearing on whether the current policy is narrowly tailored to any compelling interest the government may have.  This is a question of material fact for the jury.

Respondent's converted motion for summary judgment is DENIED as to each of Petitioner's RFRA claims.


**First Amendment Claim**

Petitioner's First Amendment claim relies on the same three alleged violations of her religious exercise as her RFRA claim. The Supreme Court has stated that "prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights."  O'Lone v. Estate of Shabazz, 482 U.S. 342, (1987) (citing Jones v. North Carolina Prisoners' Labor Union, 433 U.S. 119, 128 (1977)).  Unlike the RFRA standard, the court applies the First Amendment test with deference to the prison administrator.  See e.g., Bell v. Wolfish, 441 U.S. 520, 547 (1979).  In considering a free exercise claim under Second Circuit precedent, the court should determine "(1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of the prison officials infringes upon the

16

religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological objective." Farid v. Smith, 850 F.2d 917, 926 (2d Cir. 1988).

The court has already discussed the religious nature and sincerity of each of her beliefs as well as the substantial burden FCI Danbury has placed on those beliefs in the context of Petitioner's RFRA claim. The court will consider in turn whether FCI Danbury's policy on each of the three religious exercises "furthers some legitimate penological objective." Farid, 850 F.2d at 926.

The Supreme Court has articulated four factors used to judge the furtherance of a legitimate penological objective. See Turner v. Safley, 482 U.S. 78, 89-90 (1987). The Second Circuit has stated the Turner standard as follows:

> (i) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (ii) whether there are alternative means of exercising the right in question that remain open to prison inmates; (iii) whether accommodation of the asserted constitutional right will have an unreasonable impact upon guards and other inmates, and upon the allocation of prison resources generally; and (iv) whether there are reasonable alternatives available to the prison authorities.

Covino v. Patrissi, 967 F.2d 73, 78-79 (2d Cir. 1992)(citing Turner, 482 U.S. at 89-90).

Non-Emergency Cross-Gender Pat-Down Searches

Looking at the first Turner prong, Petitioner argues that the

legitimate penological interest must be reasonably related to cross-gender pat-down searches of *her specifically*. <u>See</u> Pet'r's Mem. 30. However, Turner's first prong deals with the "prison regulation" at issue, not just the individual. <u>See</u> <u>Covino</u>, 967 F.2d at 78. Here, that policy allows male guards to pat down female prisoners at FCI Danbury. Maintaining security and avoiding employment problems with the current, 60% male, prison staff are both legitimate penological purposes for the same reason they are compelling interests under a RFRA claim. There is a rational connection between those purposes and the policy of allowing non-emergency cross-gender pat-down searches. The standard Petitioner advances, applying only to her, would conflate the first and fourth prongs of <u>Turner</u> by essentially incorporating a "rational alternative" to the prison policy. The first prong, looking at the policy applied to all prisoners at FCI Danbury, has been met. Furthermore, Petitioner has numerous other means of practicing her religion unrelated to pat-down searches. <u>See</u> Raftery Decl. ¶ 8.

In relation to both the third and fourth prongs, however, the court is not persuaded that a rational relationship exists. Respondent argues that granting an exemption to Petitioner will open the door for other religious exemptions, making FCI Danbury's pat-down system unworkable. <u>See</u> Resp't's Reply Mem. 5. However, Petitioner has produced enough evidence that there are reasonable alternatives to raise an issue of material fact for a jury.

Specifically, Petitioner has demonstrated that FCI Danbury has given a blanket exemption to another prisoner with little or no impact on employment.[5] See Pummill Dep. 158:11-160:11.  Respondent has provided no evidence that exempting even the small group of other observant Muslim women would disrupt prison policy.  Nor is there evidence that these other women share Petitioner's beliefs about being touched.  For these reasons, Respondent has not adequately demonstrated that the challenged practice furthers a legitimate penological objective, and differences of material fact remain for a trier of fact.

Identification Photograph Without Hijab

Though the Turner standard is more deferential to the government, Petitioner has produced evidence that FCI Danbury's policy does not further a valid penological purpose.  The government's policy satisfies the first two prongs of Turner.  There is a rational connection between the prison policy and the legitimate goal of capturing escaped inmates.  See Pummill Dep. 143:12-14.  Additionally, Petitioner is able to practice her

---

[5]  For the purposes of the Turner analysis under the First Amendment, it matters little that the other prisoner had psychological, rather than religious reasons for her exemption. The mere fact that there is another successful exemption is evidence that the accommodation will not have an unreasonable effect on prison resources and that reasonable alternatives exist to the prison policy, as long as the exemption Petitioner seeks is similarly narrow.

religion at FCI Danbury and is even allowed to wear her *hijab* at all times.  <u>See</u> Forde Dep. 29:11-12.

However, for similar reasons as the pat-down claim, the third and fourth prongs of <u>Turner</u> have not been satisfied.  The availability of an alternative that places no burden on prison resources – covered and uncovered photographs of Petitioner – supports Petitioner's claim.  Respondent has provided no evidence to demonstrate that the *hijab* policy does more to promote security than Petitioner's proposed alternative, aside from the fact that it is the current BOP regulation.[6]  Whether Petitioner's alternative is a reasonable alternative remains an issue of material fact that is disputed.

<u>Failure to Provide Imam</u>

Respondent's arguments under the First Amendment on this claim fail for similar reasons as those under RFRA.  Petitioner has provided evidence that Respondent is not even providing substitutes for a qualified imam, such as weekly visits by female Muslim volunteers and the services of an imam during feasts surrounding

---

[6]  The BOP regulation has sections on "Identification Photograph" and "Account Card."  Federal Bureau of Prisons Program Statement ¶¶ 221-222 (Aug. 17, 1998).  The photograph regulation states that the inmates head must be uncovered, but the reason for this is not given.  <u>See</u> <u>id</u>.  Therefore, it may simply be for flyers in the event of escape.  The regulation on account cards states that a photograph must be taken, but says nothing about the inmate's head being uncovered.  <u>See</u> <u>id</u>. at ¶ 222.

Ramadan.  See Forde Aff. ¶¶ 8-14; Abdulrazak Aff. ¶¶ 12, 20.

In short, the court is not convinced that any of the factors in Turner have been met.  First, while there is a legitimate penological interest in excluding imams who are security threats, there is no evidence that this is the reason no imam has yet been hired.  Second, the court cannot determine that Petitioner has means of practicing her religion without an imam while there is a dispute about alternative religious services provided by FCI Danbury.  Third, it does not appear that hiring an imam would have an unreasonable impact upon prison resources, as FCI Danbury has been attempting to hire one.  See Resp't's 56(a)1 Statement ¶¶ 16-18.  However, even if it would have such an impact, Respondent would have to show evidence of that fact at trial.  Finally, because of the material difference of fact concerning the services currently being provided, Respondent has not demonstrated to the court that there are no reasonable alternatives to Petitioner's request.[7]

---

[7]  Respondent cites language from Cruz v. Beto, 405 U.S. 319 (1972), where the Court said that prisons need not provide "a chaplain, priest, or minister... without regard to the extent of the demand."  Cruz, 405 U.S. at 322 n.2.  The court agrees.  However, the Court in Cruz held that there was discrimination against Buddhism if Cruz "was denied a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts..."  Id. (remanding for a hearing and appropriate findings).  For similar reasons, a trial is necessary to resolve material differences of fact here, based on Petitioner's evidence of unreasonable opportunities to practice her faith due to FCI Danbury's failure to provide a qualified imam.

Respondent's converted motion for summary judgment is DENIED as to each of Petitioner's First Amendment claims.

## Fourth Amendment Claim

The Second Circuit has decided that prison inmates retain a limited right to bodily privacy under the Fourth Amendment.  See Covino, 967 F.2d at 78.  In considering Petitioner's claim, this court must decide whether she has exhibited a subjective expectation of privacy and whether society would consider that expectation reasonable.  See id. at 77.

Petitioner has made a sufficient showing of a subjective expectation of privacy.  See Forde Aff. ¶¶ 30-32; Forde Request for Administrative Remedy (Nov. 8, 2004)(Pet'r's Ex. B).  Specifically, she complained about FCI Danbury's pat-down procedure through appropriate means available to her at the time she was patted down. Id.  Petitioner also correctly states that the Second Circuit's Fourth Amendment analysis nowhere mentions a minimum number of searches.  See Pet'r's Mem. 42.

To determine whether Petitioner has met the objective prong of Covino, courts must use the four-part test from Turner.  See Covino 967 F.2d at 78.  FCI Danbury's cross-gender pat-down search meets the first prong of Turner for the same reasons stated in response to her First Amendment argument.  There is a legitimate penological

22

interest in prison security and in providing equal employment opportunities to both male and female staff. See, e.g., Forts, 621 F.2d 1215-16. Petitioner responds that because most states do not allow cross-gender pat-down searches, society has recognized her expectation of privacy as reasonable. See National Institute of Corrections, "Cross-Sex Search Practices: Findings from NIC Telephone Research," (Jan. 6, 1999). While this argument may show that there are alternatives to cross-gender searches, as noted under the First Amendment claim above, it does not follow that society has recognized as reasonable all female inmates' expectation not to be searched by male guards. The Department of Corrections, a federal agency with prisons nationwide, has not prohibited pat-down searches of female inmates by male guards. See id. Even if some prisons do not use a specific procedure, that procedure may still be necessary to accommodate "the myriad of institutional needs and objectives of prison facilities". Hudson v. Palmer, 468 U.S. 517, 524 (1984)(citing Wolff v. McDonnell, 418 U.S. 539, 555 (1974)).

The prison policy also meets Turner's second prong, because Respondent generally accommodates Petitioner's requests to be searched by a woman. See Pet'r's Pet. for a Writ of Habeas Corpus ¶¶ 13, 48. The court sees no further accommodation available that would be reasonable under the circumstances. See Covino, 967 F.2d at 79 (performing body-cavity searches in the inmate's room

23

appeared to the court "to be a reasonable accommodation that is sufficient to respect Covino's limited bodily privacy rights under the circumstances presented herein").

Petitioner's arguments fail under Turner's third and fourth prongs for the same reason. Because Petitioner's Fourth Amendment claim relies on her gender, the same analysis would apply to any woman at FCI Danbury who could show a subjective expectation of privacy, resulting in a full reversal of the BOP search policy. Petitioner's proposed alternative, an exemption based on the Fourth Amendment, does not help her case. The fourth Turner prong "is not a 'least restrictive alternative' test, rather it requires the inmate to 'point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests.'" Covino, 967 F.2d at 80 (quoting Turner, 482 U.S. 90-91). A policy that would entirely disrupt FCI Danbury's search procedures or employment practices does not amount to an alternative that only places a de minimus cost on the prison and its security interest. See Pummill Dep. 104:23-25. Petitioner has presented no evidence of disputed material facts on this point. For this reason, application of the Turner standards leads to a different result in the Fourth Amendment context than it did in under the First Amendment.

Respondent relies heavily on Colman v. Vasquez, 142 F.Supp. 2d 226, 232 (D.Conn. 2001). See Pet'r's Mem. 39-41. However, in

<u>Colman</u> the court refused to dismiss the case because dismissal would have required a "finding that all types of pat searches are generically lawful," without factual inquiries or consideration of penological justification.  See <u>Colman</u>, 142 F.Supp. 2d at 232. Here, the court agrees that all types of pat-down searches are not generically lawful.  However, for the reasons stated above, the policy in this case is rationally related to legitimate security and employment interest of the government.[8]

Ultimately, Petitioner has provided no reasonable alternative under the Fourth Amendment analysis.  Because FCI Danbury is a women's prison, any alternative proposed by Petitioner would become available to all women in the prison.  There is no reason to base individual protection under the Fourth Amendment on Petitioner's religious beliefs.  Indeed, Petitioner retains the protections of the First Amendment and RFRA for this very purpose.

Respondent's converted motion for summary judgment is GRANTED as to Petitioner's Fourth Amendment claim.


**First Amendment Retaliation Claim**

Respondent argues for summary judgment on Petitioner's First

---

[8]  The court also notes that Petitioner has presented no psychological concerns about sexual trauma for herself, as there was for the inmate at issue in <u>Colman</u>.  See <u>Colman</u>, 142 F.Supp. 2d at 231-32. Such a factor could have narrowed the accommodation Petitioner is requesting.

Amendment retaliation claim based on jurisdictional problems and lack of a valid retaliation claim.  See Resp't's Reply Mem. 10-11. The court need only consider the validity of the retaliation claim if there are no jurisdictional problems.

28 U.S.C. § 2241 is a proper means to challenge the execution of a sentence, while § 2255 is the proper means to challenge the imposition of a sentence.  See Jiminian v. Nash, 245 F.3d 144, 146 (2d Cir. 2001).  Specifically, in a § 2241 action a prisoner may seek relief from disciplinary actions taken against her.  See Adams v. United States, 372 F.3d 132, 135 (2d Cir. 2004).

However, § 2241 requires that a prisoner must be "illegally held" to bring a habeas action challenging the execution of her sentence.  28 U.S.C. § 2241(c)(3).  Petitioner states that she satisfies this requirement because retaliation is an unconstitutional condition of confinement.  See Pet'r's Mem. 47. However, the case Petitioner relies on does not make nearly such a sweeping claim.  See Porter v. Nussle, 534 U.S. 516, 531 (2002).[9] Petitioner is not currently illegally held, and she provides no evidence that she is.  Even if Respondent retaliated illegally, seven days in segregated housing in 2005 is not sufficient basis at

---

[9]  Porter, which does not involve § 2241, held that particular episodes and general circumstances should be treated equally under the exhaustion requirements of the Prison Litigation Reform Act of 1995.  See id.

present for a habeas claim.[10]   Were Petitioner currently held in Segregated Housing, § 2241 would be an appropriate vehicle for her retaliation claim, and the court could apply the appropriate legal test to her claim.   See Gill, 389 F.3d at 380.   The court does not need to determine whether § 2241 would also be appropriate had Petitioner provided evidence that she is being retaliated against in some other way or on some kind of continuing basis.   She has provided no evidence that demonstrates that she is.   In other retaliation cases, including those cited by Petitioner, inmates were either currently retaliated against or brought their claims under 42 U.S.C. § 1983, as Petitioner unsuccessfully attempted to do initially.   See, e.g., id. at 383.

Habeas corpus under § 2241 is an inappropriate vehicle for Petitioner's retaliation claim because she is not illegally held. The court need not consider whether there are any disputed issues of material fact.   Respondent's converted motion for summary judgment is GRANTED as to Petitioner's First Amendment retaliation claim.


**Conclusion**

---

[10]   The court notes that Petitioner was held in SHU for seven days while her claim was investigated rather than "weeks."   The Second Circuit has not defined a time limit for such action to be impermissibly retaliatory, and it is unnecessary to do so in this case.   See, e.g., Gill v. Pidlypchak, 389 F.3d 379, 384 (2d Cir. 2004).

For the foregoing reasons, Respondents' converted motion for summary judgment [Doc. No. 30] is GRANTED IN PART and DENIED IN PART.  Counsel for the parties are directed to confer and to present to the court within thirty (30) days of the date of this ruling a proposed scheduling order, setting forth a date for the submission of a joint trial memorandum and a date when this case will be ready for trial.


SO ORDERED


/s/ Ellen Bree Burns, SUDJ

ELLEN BREE BURNS

SENIOR U.S. DISTRICT JUDGE


Dated at New Haven, Connecticut this 2nd day of April, 2009.