UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BEVERLEY FORDE, | : | |
| | : | |
| Petitioner, | : | |
| | : | |
| v. | : | CIVIL NO. 3:03CV1424(EBB)(JGM) |
| | : | |
| MAUREEN BAIRD, | : | |
| Warden, FCI Danbury, | : | |
| | : | |
| Respondent. | : | February 19, 2010 |

## PETITIONER'S POST-TRIAL BRIEF

### INTRODUCTION

Petitioner Beverley Forde has been an observant Muslim for 17 years and is an inmate at the Federal Correctional Institution in Danbury, Connecticut ("FCI Danbury"), where she is regularly subjected to intrusive pat searches by male staff.  (Forde, Tr. Vol. 1, 7:12-8:4; 11:23-13:24).[1]  As a devout Muslim, Ms. Forde seeks to live her life according to the teachings of the Qur'an, and being physically touched by men who are not members of her immediate family is deeply offensive to her religious beliefs.  Respondent's policy of routinely subjecting female inmates to pat searches by male staff in non-emergency circumstances violates Ms. Forde's rights under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1, and the

---

[1]     Citations to the trial transcript and exhibits appear in parentheses within the text of the brief.  Transcript citations identify the witness offering testimony and the volume, page, and line number(s) of the testimony.

First Amendment. With this habeas petition, Ms. Forde seeks an individual exemption from this policy.

Following a ruling denying Respondent summary judgment on this matter, the Court held a bench trial from December 14 to 17, 2009. At trial, Ms. Forde plainly met her burden under RFRA of establishing that Respondent's policy of subjecting Ms. Forde to routine pat searches by male staff substantially burdens her exercise of religion. *See* 42 U.S.C. §§ 2000bb-1(a). Respondent, on the other hand, failed to meet its burden of demonstrating that this policy "is in furtherance of a compelling governmental interest" *and* "is the least restrictive means of furthering that interest." 42 U.S.C. §§ 2000bb-1(b). Ms. Forde also met her burden with regard to her First Amendment claim. The evidence presented at trial established that Respondent's policy infringes upon Ms. Forde's sincerely held religious belief and that Respondent's refusal to grant Ms. Forde an individual exemption from this policy does not further a legitimate penological objective. *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988).

## PROCEDURAL BACKGROUND

The issues in this case were narrowed substantially before trial. This case began in 2003 when Ms. Forde filed a petition for a writ of habeas corpus under 28 U.S.C. §§ 2241 and 2243 to address three issues relating to her freedom of religious exercise while in Respondent's custody: 1) Respondent's refusal to grant her an exemption from a policy requiring her to display a photo identification card in which she was pictured without her religious head covering; 2) Respondent's failure to provide an *imam* to conduct mandatory Friday prayer services; and 3) Respondent's refusal to grant her an exemption from routine pat searches by male staff.

Shortly before trial, Respondent issued Ms. Forde a new identification card depicting her in her head covering and contracted with an *imam* to conduct weekly prayer services.[2] Thus, the only issue addressed at trial and remaining before this Court for resolution is whether Respondent's refusal to grant Ms. Forde an individual exemption from routine pat searches by male staff violates RFRA and the First Amendment.

At the summary judgment stage of this case, the Court identified specific issues of material fact that would need to be resolved at trial regarding the pat search claims. In particular, the Court explained that, in relation to the RFRA claim, "[t]here are material issues of fact as to whether Ms. Forde's exercise of religion has been substantially burdened and whether FCI Danbury's policy furthers a compelling governmental interest and is the least restrictive means of furthering that interest." *Forde v. Zickefoose*, 612 F. Supp. 2d 171, 178 (D. Conn. 2009). The Court determined at that stage that "Respondent ha[d] not met its high burden of demonstrating to the court that FCI Danbury's policy with regard to Petitioner is narrowly tailored." *Id*. Furthermore, the Court stated that it could not grant Respondent's motion for summary judgment on the substantial burden point because it found that "regular cross-gender pat-down searches would place a substantial burden on Petitioner's exercise of her religion." *Id*. The Court noted that, during the pretrial phase, Ms. Forde had provided evidence that she was subject to regular cross-gender pat searches and that "Respondent [was] free to challenge this allegation at trial." *Id*. Respondent never offered contrary evidence at trial. Regarding the First Amendment claim, the Court stated that, "Respondent has not adequately demonstrated that the challenged practice

---

[2]    The Court's summary judgment ruling also narrowed the issues by granting Respondent's motion for summary judgment with regard to Ms. Forde's Fourth Amendment and First Amendment retaliation claims. Thus, the only legal claims remaining are Ms. Forde's claims under RFRA and the First Amendment. *Forde v. Zickefoose*, 612 F. Supp. 2d 171 (D. Conn. 2009).

furthers a legitimate penological objective."  *Id*. at 181.  The Court noted that "Petitioner has produced enough evidence that there are reasonable alternatives [to the challenged practice] to raise an issue of material fact."  *Id*.  As set forth below, Respondent failed to meet its burden on these issues at trial.

**FACTS ESTABLISHED AT TRIAL**

At the four-day bench trial in this case, the Court heard from six witnesses.  In addition to providing her own testimony, Ms. Forde presented testimony from Dr. Anver Emon, an expert on the Islamic faith, and Eugene Miller, a correctional security expert.   The Respondent presented expert testimony on the Islamic religion from Imam Matthew Hamidullah and on correctional security from Edda Cantor.  Respondent also called Donna Zickefoose, the former Respondent and former Warden at FCI Danbury.

**Ms. Forde's Religious Beliefs**

Ms. Forde has been an observant Muslim for 17 years.  (Forde, Tr. Vol. 1, 7:20-8:4).  Since her conversion, Ms. Forde has faithfully practiced her religion by praying five times a day, observing the month-long Ramadan fast each year, and consistently wearing a head covering (called a *hijab*).  (Forde, Tr. Vol. 1, 8:18-25; 9:19-10:2).  Ms. Forde seeks to live according to Islamic practice and the teachings of the Qur'an.  (Forde, Tr. Vol. 1, 30:4-31:2; Ex. P).  The Qur'an is a foundational holy book of the Islamic faith that sets forth the code of conduct "that speaks to how Muslims should govern themselves in this world as they live . . . their lives." (Emon, Tr. Vol. 1, 94:15-21; 95:17-25).  As Petitioner's religious expert, Dr. Anver Emon, explained, Islam is a religion that identifies the appropriate means of pursuing practices as varied as praying, ritual purity, and male-female relationships, and it "is meant to cover the full totality of what a human being would do in this world."  (Emon, Tr. Vol. 1, 95: 2-

12).  Ms. Forde sincerely believes that her religion requires her to organize her life according to the Qur'an, and she "live[s] [her] life to please [her] Lord and follow his rules and regulations." (Forde, Tr. Vol. 1, 8:5-17; 33:10-18; *see also* Ex. P ("I must obey my Lord."); Ex. R ("[M]y religion is the main purpose of my life.")).

One important set of Islamic regulations limits contact between men and women who are not related by blood or marriage.  (Emon, Tr. Vol. 1, 98:22-99:14; Hamidullah, Tr. Vol. 3, 29:23-30:11; 47:16-23; Forde, Tr. Vol. 1, 9:3-9).  Both Dr. Emon and Imam Hamidullah testified that the restriction of male-female contact to the circle of men in a woman's immediate family is central to Islamic principles of modesty and purity.  (Emon, Tr. Vol. 1, 99:15-100:7; Hamidullah, Tr. Vol. 3, 47:24-48:9).  Both religious experts testified that there is a general prohibition in Islam against physical touching between women and men outside this close family circle (called the *mahram*).  (Emon, Tr. Vol. 1, 98:22-99:14; Hamidullah, Tr. Vol. 3, 29:23-30:11; 47:16-23). The two religious experts also explained that an observant Muslim woman's religious beliefs would be violated by physical contact with a man outside of her immediate family even if this contact was forced upon her.  (Emon, Tr. Vol. 1, 116:12-17; Hamidullah, Tr. Vol. 3, 51:13-52:14).

Pursuant to these widely recognized Islamic doctrines of modesty and purity, Ms. Forde sincerely believes that her faith forbids her from being touched—or even to be seen unveiled— by men outside of her immediate family.  (Forde, Tr. Vol. 1, 10:16-24).  Hence she wears a head covering daily and, earlier in this litigation, sued to ensure that unrelated men would not routinely see a photograph of her unveiled appearance.  (Forde, Tr. Vol. 1, 9:3-9; 10:16-24; *see also* Ex. P).  To be physically touched by men outside her family is anathema to Ms. Forde's religious beliefs.  (Forde, Tr. Vol. 1, 13:1-10; 33:15-34:2; *see also* Ex. N ("My religion explains

that it is unlawful to be physically touched by a male that is not your husband, father, brother, uncle, nephew, or son."); Ex. U ("It is against my religion to be touched in any manner by a male that is not an immediate family member.")).

Due to the intrusive physical touching involved in a pat search, Ms. Forde believes that it is a desecration of her modesty and her religious values to be pat searched by a man. (Forde, Tr. Vol. 1, 13:1-10; 33:15-34:2; 70:12-17). Male staff are trained by Respondent to conduct a pat search by using their hands to press directly against various parts of the female inmate's body, including her waistband, the area between and underneath her breasts, her crotch, her buttocks, and her legs.[3] (Ex. 27). Repeatedly and over the course of many years, Ms. Forde has stated that such pat searches conducted by men are fundamentally in conflict with her religious beliefs. (Ex. N; Ex. P; Ex. U). Ms. Forde's religious views on pat searches are informed by her understanding of the Qur'an and the Hadith—Islamic religious texts that she reads regularly. (Forde, Tr. Vol. 1, 10:21-24; 27:6-28:3; Ex. P (quoting the Qur'an)). Ms. Forde has also spoken to Islamic religious leaders working under BOP contract, who agreed that it is a violation of her religion to be pat searched by men. (Forde, Tr. Vol. 1, 50:11-24).

Ms. Forde's beliefs regarding the prohibition from being touched by men outside of her family are commonly held by Muslims worldwide. (Emon, Tr. Vol. 1, 101:1-4). Dr. Emon testified that adherents to Ms. Forde's religion would find it "Islamically unacceptable" for a Muslim woman to be pat searched by a man outside her immediate family. (Emon, Tr. Vol. 1, 99, 101:19-25; 108:5-14). The testimony of Dr. Emon demonstrated that Ms. Forde's belief that

---

[3]     At trial, the Court watched the Federal Bureau of Prisons ("BOP") training video, which is used to instruct male staff on how to pat search female inmates. (Ex. 27). BOP Program Statement 5521.05 defines a pat search as "an inspection of an inmate, using the hands, that does not require the inmate to remove clothing," and indicates that "staff may conduct a pat search of an inmate on a routine or random basis to control contraband." (Ex. J. at 2).

Islam does not permit her to be pat searched by male staff is not only sincere, but also firmly supported by Islamic law and tradition.  (Emon, Tr. Vol. 1, 99, 101:19-25).

**The Burden that Respondent Has Imposed on Ms. Forde's Religious Exercise**

Respondent's policies and practices directly burden Ms. Forde's exercise of religious traditions of modesty and purity.  The testimony at trial established that Ms. Forde has been pat searched by men on numerous occasions while at FCI Danbury as a result of Respondent's policy of requiring routine pat searches of female inmates by male staff.  (Forde, Tr. Vol. 1, 11:23-25; 12:4-8; 41:19-25; 45:19-21; Ex. J).  Although Ms. Forde regularly identifies herself as a Muslim and asks to be searched by a woman instead of a man, the pat searches by men have continued.  (Forde, Tr. Vol. 1, 43:12-16).  These searches place a substantial burden on Ms. Forde's ability to live in accordance with her religious beliefs.

Respondent has consistently refused Ms. Forde's requests to be searched by female staff. (Forde, Tr. Vol. 1, 58:10-13).  On one occasion, after Ms. Forde requested that a female staff member search her, officers ordered Ms. Forde to submit to a strip search and placed her in the Special Housing Unit ("SHU"), deeming her *request* to be disobedience of a direct order.[4] (Forde, Tr. Vol. 1, 19-23; *see also* Ex. T).  Respondent's male officers have regularly pat searched Ms. Forde, even in the presence of female staff.  (Forde, Tr. Vol. 1, 41:19-25).  In 2007, Ms. Forde was pat searched by a male officer while exiting the Ramadan feast, as were the other Muslim women who had attended the meal, despite the nearby presence of a female staff

---

[4]     Although Ms. Forde was kept in SHU for two to three weeks for requesting a pat search by a woman, no disciplinary charges were ever brought against her, as prison officials ultimately found no cause to discipline her. (Forde, Tr. Vol. 1, 23: 17-22).

member.[5]  (Forde, Tr. Vol. 1, 39:16-18; 40:13-41:18).  In 2008, Ms. Forde was pat searched repeatedly within a span of 88 days by male officers in the presence of available female officers. The searches continued even after Ms. Forde spoke to the lieutenant in charge of the unit and asked that she be pat searched by available female staff instead.  (Forde, Tr. Vol. 1, 42:20-21; Ex. U).

Ms. Forde has filed all available administrative grievances, in which she repeatedly stated to Respondent that it is a violation of her religion to be subjected to pat searches by men.[6] (Forde, Tr. Vol. 1, 39:6-11).  Despite Ms. Forde's numerous administrative grievance filings, the burden on her religious beliefs and practice is ongoing; Respondent has made no change in policy and continues to subject Ms. Forde to pat searches by male staff. (Forde, Tr. Vol. 1, 30:11-19; 35:9-13; 38:22-39:1).

**The Effect of an Individual Exemption on Employment and Prison Security**

Respondent presented no evidence at trial demonstrating that the refusal to grant Ms. Forde an individual exemption from non-emergency pat searches by male staff enhances the employment practices or security of FCI Danbury; nor did it suggest some other form of state

---

[5]       At the end of a month of fasting, observant Muslims like Ms. Forde have a feast called *Eid-ul-fitr* to celebrate the revelations of the Qur'an.  This holiday is an important part of the Islamic faith.  (Forde, Tr. Vol. 1, 39:12-40:5).

[6]       On November 8, 2004, Ms. Forde filed a Request for Administrative Remedy requesting, inter alia, that she be exempted from FCI Danbury's cross-gender pat searches.  (Ex. N).  On December 3, 2004, Warden William Willingham denied Ms. Forde's Request for Administrative Remedy, citing Program Statements concerning pat searches.  (Ex. O).  Between December 3, 2004, and January 19, 2005, Ms. Forde appealed the Warden's decision regarding the Administrative Remedy to the Northeast Regional Director of the Federal Bureau of Prisons. (Ex. P).  On January 19, 2005, Regional Director D. Scott Dodrill denied the Ms. Forde's appeal. (Ex. Q).  On February 8, 2005, Ms. Forde filed a Central Office Administrative Remedy Appeal to the National Inmate Appeals Administrator challenging the Regional Director's Response. (Ex. R).  On April 20, 2005, Administrator of National Inmate Appeals Harrell Watts denied the Ms. Forde's appeal.  (Ex. S).

interest that would justify burdening Ms. Forde's religious practice.  Indeed, the evidence at trial established that at least two inmates at FCI Danbury have been administratively exempted from being pat searched by male staff in non-emergency situations since 1999 without any negative impacts on employment or prison security at FCI Danbury, the precise remedy sought by Ms. Forde in this case.  (Zickefoose, Tr. Vol. 2, 181:11-20; 182:5-183:11; Miller, Tr. Vol. 1, 201:13-17; 202:1-18; Cantor, Tr. Vol. 2, 136:18-22).

### *Employment*

Respondent produced no evidence at trial of any staffing or other employment-related problems that would result from granting Ms. Forde an individual exemption from pat searches by male staff.  To the contrary, the Court heard testimony from Warden Zickefoose that no deleterious effects on employment at FCI Danbury resulted from the individual exemptions Respondent has already granted to two other inmates.  (Zickefoose, Tr. Vol. 2, 182:5-183:11).

Respondent already exempts *all* female inmates from routine visual ("strip") searches by male staff.[7]  (Miller, Tr. Vol. 1, 169:17-19; Zickefoose, Tr. Vol. 2, 185:20-23; *see also* Ex. J). Most visual searches at FCI Danbury take place at predictable times and places.  For example, visual searches at FCI Danbury are regularly done in the receiving and discharge area of the facility, as well as in SHU.  (Cantor, Tr. Vol. 2, 75:21; Zickefoose, Tr. Vol. 2, 185:24-186:3).  In addition, visual searches are conducted after all contact visits with inmates.  (Cantor, Tr. Vol. 2, 76:6-9; Zickefoose, Tr. Vol. 2, 185:24-186:3).  Respondent's policy requires female staff to conduct routine visual searches at FCI Danbury. (Miller, Tr. Vol. 1, 169:17-19; Zickefoose, Tr. Vol. 2, 185:20-23; *see also* Ex. J).

Similarly, Respondent has presented no evidence of any staffing problems that would

---

[7]     A visual search, commonly called a strip search, is a visual inspection of all body surfaces. (Miller, Tr. Vol. 1, 168:16-19; Zickefoose, Tr. Vol. 2, 185:4-14; Ex. J).

arise from the granting of an individual pat search exemption to Ms. Forde.  Like visual searches, the "vast majority" of pat searches at FCI Danbury are performed at predictable times and locations, such as after meals at the dining hall and at closing times in work areas such as UNICOR.  (Cantor, Tr. Vol. 2, 85:16-21; Miller, Tr. Vol. 1, 218:24-219:2; s*ee also* Miller, Tr. Vol. 1, 140:14-141:1; Zickefoose, Tr. Vol. 2, 180:22-181:7).  One out of every three staff members at FCI Danbury is female.  (Miller, Tr. Vol. 1, 162:12-14; Ex. M).  Female staff are stationed throughout the institution, staffing the dining hall, the work areas, and the housing units.  (Miller, Tr. Vol. 1, 170:2-12, 171:2-6).  If a female staff member is not physically present to conduct a pat search, she can easily be summoned.  (Miller, Tr. Vol. 1, 171:14-20; 174:22-175:5; Zickefoose, Tr. Vol. 2, 179:7-180:2).  All correctional officers at FCI Danbury carry hand-held radios, which they use to communicate with other correctional staff in the institution.  (Miller, Tr. Vol. 1, 171:14-20).  In lieu of pat searching a female inmate in a non-emergency situation, a male correctional officer can request a nearby female officer to conduct the pat search or use his hand-held radio to call for a female officer to conduct the pat search.  (Miller, Tr. Vol. 1, 171:14-20; 174:22-175:5; Zickefoose, Tr. Vol. 2, 179:7-180:2).  Walking from the UNICOR work area to the dining hall at FCI Danbury takes no more than five minutes.  (Miller, Tr. Vol. 1, 173:1-8).

In addition, the Master Agreement between the officers' union and the BOP governing labor relations at FCI Danbury does not prohibit the granting of an individual exemption from cross-gender pat searches.  (Miller, Tr. Vol. 1, 167:10-18; Ex. K; Ex. 25).[8]  Indeed, Respondent is able to effectuate its policy of barring non-emergency visual searches of female inmates by

---

[8]     Two versions of the Master Agreement were introduced at trial (Ex. K and Ex. 25).  The language regarding staff assignments in both documents is the same, and neither bars the granting of an individual exemption.  (Zickefoose, Tr. Vol. 2, 192:18-193:25; Miller, Tr. Vol. 1, 167:10-18; Ex. K; Ex. 25).

male staff without violating the Master Agreement. (Zickefoose, Tr. Vol. 2, 186:12-190:11; *see also* Ex. K; Ex. 25).

*Security*

Respondent failed to present any evidence at trial of security problems that would result from granting Ms. Forde an individual exemption from routine pat searches by male staff. Critically, Warden Zickefoose testified that no deleterious effects on security resulted from the two individual exemptions granted to other inmates at FCI Danbury. (Zickefoose, Tr. Vol. 2, 182:5-183:11).

The Court also heard testimony from two correctional security experts in this case, Eugene Miller for the Petitioner and Edda Cantor for the Respondent. Mr. Miller has more than four decades of experience in corrections, including operational experience, faculty positions, and criminal justice consulting. (Miller, Tr. Vol. 1, 118:4-22, 120:9-121:21; Ex. B). In the past year alone, he has visited correctional institutions in eight to ten states, and has been to more than 800 institutions over the course of his career.[9] (Miller, Tr. Vol. 1, 121:22-122:9). By contrast, Ms. Cantor's last full-time position in corrections was in 2001, and her experience in corrections is limited almost entirely to the state of New Hampshire.[10] (Cantor, Tr. Vol. 2, 43:6-16).

At trial, Mr. Miller provided substantial evidence that granting Ms. Forde an individual

---

[9]      Mr. Miller regularly attends workshops and conferences and keeps current with the literature in the field of corrections. (Miller, Tr. Vol. 1, 119:15-120:8). He has written numerous articles and other publications in the field of corrections. (Miller, Tr. Vol. 1, 122:22-123:4; Ex. B). He has qualified as a corrections expert and offered testimony in more than 75 cases. (Miller, Tr. Vol. 1, 124:15-24).

[10]      Ms. Cantor has written no articles or books on corrections. (Cantor, Tr. Vol. 2, 45:6-8). Over the past five years, she has visited a total of five to eight correctional institutions, averaging only one to two prison visits over the course of a full year. (Cantor, Tr. Vol. 2, 45:9-11). She has testified as an expert in only one other case (Cantor, Tr. Vol. 2, 44:16-18).

exemption would not detract from security at FCI Danbury.[11]   With regard to an individual exemption, Mr. Miller explained that the summoning of a female officer to conduct a pat search would result in no security threat or other harm to FCI Danbury.  (Miller, Tr. Vol. 1, 175:6-14). Mr. Miller noted that Respondent's current blanket prohibition on routine visual searches of female inmates by male staff does not negatively impact security at FCI Danbury.  (Miller, Tr. Vol. 1, 169:20-170:1).

Mr. Miller also testified that the general practice of having male staff pat search female inmates undermines order and security, rather than enhancing it.  (Miller, Tr. Vol. 1, 192:6-14). He observed that during his tour of FCI Danbury, only two out of five male officers stationed at UNICOR performed adequate searches of the female inmates leaving the shop area.  (Miller, Tr. Vol. 1, 141:17-25).  Mr. Miller explained that male staff may perform less thorough searches of female inmates because they are concerned about allegations of misconduct.  (Miller, Tr. Vol. 1, 191:19-192:5).  This failure to adequately search female inmates would itself pose a security threat to FCI Danbury.  (Miller, Tr. Vol. 1, 145:19-146:12).

Moreover, if female inmates accuse a male officer of misconduct, staff reassignment and an internal investigation may be necessary.  This harms the orderly running of the institution and drains institutional resources.  (Miller, Tr. Vol. 1, 191:4-18).  Hence Mr. Miller and Ms. Cantor both testified that even unsubstantiated accusations of misconduct are disruptive to the institution.  (Miller, Tr. Vol. 1, 191:19-192:5; Cantor, Tr. Vol. 2, 103:8-14).

As demonstrated through the evidence at trial, the link between pat searches and accusations of staff misconduct has been widely recognized.  In September 2009, the U.S.

---

[11]     Mr. Miller offered significantly more extensive testimony than Ms. Cantor in this case. His testimony on direct examination covers more than 80 transcript pages; Ms. Cantor's covers 10.  (*See* Miller, Tr. Vol. 1, 125:9-206:7 and Cantor, Tr. Vol. 2, 47:9-57:18).

Department of Justice Office of the Inspector General ("OIG") published a report titled, *The Department of Justice's Efforts to Prevent Staff Sexual Abuse of Federal Inmates*.  (Ex. E).  The OIG Report states, "BOP officials believed that male staff members were most often accused of sexual misconduct stemming from pat searches."  (Ex. E, at 26).  The National Prison Rape Elimination Commission, created by Congress, recently called for the prohibition of routine cross-gender pat searches, in part because the Commission found that searches carried out by staff of the opposite gender heighten the potential for abuse.  (Ex. F).  Indeed, FCI Danbury has experienced a particularly high number of allegations of staff misconduct.  According to the OIG Report, from 2001 to 2008, Danbury ranked fifth in the number of allegations of staff abuse of inmates among the 113 BOP-managed institutions providing data.[12]  (Ex. E, at 85).

Accordingly, the prevailing practice in the vast majority of prison systems in the United States is to prohibit pat searches of female inmates by male staff altogether in non-emergency situations.  (Miller, Tr. Vol. 1, 189:13-18).  These prisons maintain security without allowing routine pat searches of any female inmates by male staff.  (Miller, Tr. Vol. 1, 190:9-23).  A 1999 survey by the National Institute for Corrections showed that only five states and the Federal Bureau of Prisons permitted pat searches of female inmates by male staff on a routine basis.  (Ex. G).  Since 1999, three of those states—Michigan, New Hampshire, and New York—have changed their policies to restrict pat searches of female inmates by male staff.  (Exs. G, H, and AA; Miller, Tr. Vol. 1, 183:3-19; Cantor, Vol. 2, 87:8-14).  At least two other states—California and Florida—have clarified their policies to firmly prohibit pat searches of female inmates by

---

[12]    This likely understates the number of allegations of staff sexual abuse at FCI Danbury.  Unlike the other BOP institutions, Respondent did not report to the OIG allegations determined to be unfounded, which means the total number of allegations (founded and unfounded) at FCI Danbury is likely to be higher.  (Ex. E, at 41).

male staff in non-emergency situations.[13]  (Exs. I and BB).

The clear and overwhelming national trend in corrections is to prohibit male staff from routinely pat searching female inmates.  (Ex. G).  Respondent is "almost a lone holdout" among U.S. correctional systems in continuing to permit male staff to routinely pat search female inmates.  (Miller, Tr. Vol. 1, 205:16-206:1-3).  The decision by more than 40 states, including California, Florida, Michigan, New Hampshire, and New York, to prohibit male staff from routinely pat searching female inmates has not undermined security in those correctional systems.  (Miller, Tr. Vol. 1, 190:9-23).  Respondent's security expert, Ms. Cantor, testified that she was not even aware of the number of states that currently permit routine pat searches of female inmates by male staff; nor was she aware of the impact on security in states that had prohibited the practice.  (Cantor, Tr. Vol. 2, 92:24-93:2; 111:9-114:6, 120:9-18, 137:5-18).[14]

Not only did Respondent fail to present any evidence suggesting that these blanket prohibitions on male staff searching female inmates undermined institutional security, it failed to show how an individual exemption could possibly undermine security.  But this is unsurprising in light of the fact that Respondent *already has* a policy exempting individual female inmates from routine pat searches by male staff.[15]  At trial, Respondent identified absolutely no negative

---

[13]     California permits them only "to avoid the threat of death, escape, or great bodily injury."  (Ex. I).  Florida allows them only to prevent "an imminent threat of physical violence." (Ex. BB).

[14]     Ms. Cantor testified that she did not know the current pat search policies in California and New York—by her own admission, two of the largest correctional systems in the country— nor was she aware of the policies in Florida, Michigan, or Rhode Island.  (Cantor, Tr. Vol. 2, 92:20-22, 111:9-114:6, 120:9-18, 137:5-18).  She was also unaware of any corresponding impact on security of those policies.  (Cantor, Tr. Vol. 2, 92:20-22, 111:9-114:6, 120:9-18, 137:5-18).

[15]     The fact that the prior exemptions appear to have been based on psychological, rather than religious, objections to nonconsensual touching by male staff is immaterial; no matter what the reason, such individual exemptions have been proven feasible.  *See Forde*, 612 F. Supp. 2d at 181 n.5 ("[I]t matters little that the other prisoner had psychological, rather than religious reasons for her exemption. The mere fact that there is another successful exemption is evidence that the

impacts on prison security at FCI Danbury that have resulted from these individual exemptions. (Zickefoose, Tr. Vol. 2, 182:5-183:11; Miller, Tr. Vol. 1, 202:1-18).   Respondent's security expert, Ms. Cantor, testified that she was not aware of any erosion in security resulting from Respondent's existing exemptions.   (Cantor, Tr. Vol. 2, 136:18-22).   Since Respondent has already administratively exempted at least two women from routine pat searches by male staff, granting Ms. Forde a similar exemption would have no noticeable effect on prison security or the orderly running of FCI Danbury.  (Miller, Tr. Vol. 1, 203:13-16).

## ARGUMENT

Ms. Forde petitions this Court for relief pursuant to (1) the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1, and (2) the First Amendment.  In light of the evidence presented at trial, Ms. Forde has met her burden with regard to both claims, while Respondent, who bears much of the burden of proof under the relevant burden-shifting frameworks, has not.  The protection of religious exercise afforded by RFRA overlaps with and exceeds that provided by the First Amendment.  Thus, if the Court finds a violation of RFRA, it need not reach the constitutional question of whether Respondent's policy violates the First Amendment.[16]  It is nonetheless clear that Respondent's refusal to grant Ms. Forde an individual exemption from routine pat searches by male staff violates *both* RFRA and the First Amendment.

---

accommodation will not have an unreasonable effect on prison resources and that reasonable alternatives exist to the prison policy, as long as the exemption Ms. Forde seeks is similarly narrow.").

[16]    It is a familiar, prudential rule that courts generally do not reach constitutional issues if the case can be resolved on statutory grounds.  *See, e.g.*, *Union Pacific R. Co. v. Brotherhood of Locomotive Engineers*, 130 S.Ct. 584 (2009); *Tyler v. Douglas*, 280 F.3d 116 (2d Cir. 2001); *United States v. Leon*, 766 F.2d 77, 78 (2d Cir. 1985) ("We follow the rule that a court should not reach constitutional issues when there are other, nonconstitutional grounds upon which it can resolve the case.  That is to say, a court should decide no more than is necessary.").

I.  **RESPONDENT'S POLICY OF SUBJECTING MS. FORDE TO ROUTINE PAT SEARCHES BY MALE STAFF VIOLATES RFRA.**

Congress has determined that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the "[g]overnment . . . demonstrates that the application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." RFRA, 42 U.S.C. §§ 2000bb-1(a), (b). Thus, Ms. Forde's only evidentiary burden under RFRA is the initial obligation of demonstrating that Respondent's action substantially burdens her exercise of religion. This she has clearly shown. Once that showing is made, the onus shifts to the Respondent to prove that the policy burdening Ms. Forde's religious exercise both furthers a compelling governmental interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000bb-1(b); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-31 (2006). Respondent, however, has fallen far short of proving that its refusal to grant Ms. Forde an exemption furthers either of the compelling government interests it asserts, maintaining security and avoiding employment problems, or that this refusal is the least restrictive means of furthering Respondent's asserted interests. Because the government has made neither requisite demonstration, Ms. Forde is entitled to relief under RFRA.

A. **Respondent Has Substantially Burdened Ms. Forde's Exercise of Her Religion.**

Ms. Forde provided evidence establishing the sincerity of her religious beliefs and the substantial burden placed on those beliefs by Respondent's policy of subjecting female inmates to routine pat searches by male staff. Respondent provided no evidence at trial disputing the sincerity of Ms. Forde's religious beliefs; nor did Respondent provide any evidence contesting

the fact that Ms. Forde is subject to FCI Danbury's policy.  Ms. Forde has thus met her burden

under RFRA by demonstrating that Respondent's refusal to grant her an exemption from non-

emergency cross-gender pat searches "substantially burden[s] [her] exercise of religion."  RFRA,

42 U.S.C. §§ 2000bb-1(a).

> ### 1.  Ms. Forde sincerely believes that her religion does not permit her to be pat searched by men.

Under RFRA, "religious exercise" is defined as "any exercise of religion, whether or not

compelled by, or central to, a system of religious belief."   42 U.S.C. §§ 2000bb-2(4),

*incorporating* 42 U.S.C. §§ 2000cc-(5). When making a determination under RFRA, "[t]he

court's scrutiny of whether [Ms. Forde] deserves free exercise protection extends only to whether

she 'sincerely holds a particular belief and whether the belief is religious in nature.'"  *Forde v.*

*Zickefoose*, 612 F. Supp. 2d 171, 177 (D. Conn. 2009) (quoting *Jolly v. Coughlin*, 76 F.3d 468,

476 (2d Cir. 1996)).

At the summary judgment stage of this litigation, this Court found, as Respondent then

conceded, that Ms. Forde's religious beliefs are sincerely held.  *See Forde*, 612 F. Supp. 2d at

177 ("[A]s Respondent concedes, Petitioner's Muslim faith is sincerely held." (citing Resp't's

Mem. 16)).   The evidence presented at trial further reinforces this finding.  Ms. Forde's

uncontroverted testimony was that being pat searched by men is deeply offensive to her and to

the religious value Islam places on the modesty of Muslim women and the sanctity of the

*mahram*.  (Forde, Tr. Vol. 1, 13:1-10; 33:15-34:2).  This testimony is consistent with statements

Ms. Forde has made while seeking administrative remedies to Respondent's pat search policy

over the course of the last six years.  (*See, e.g.,* Ex. N; Ex. P; Ex. U).  Respondent presented

absolutely no evidence disputing the sincerity of Ms. Forde's beliefs.  Ms. Forde testified that

she reads the Qur'an regularly, prays five times a day, and consistently wears a head covering to

protect her modesty.  (Forde, Tr. Vol. 1, 8:18-25; 9:19-10:2).  The record clearly demonstrates that Ms. Forde is pursuing an exemption from pat searches by men out of a good-faith effort to live according to the manner deemed appropriate by her religion. (Forde, Tr. Vol. 1, 8:5-17; 33:10-34:2).  There is nothing in the record to indicate that Ms. Forde is anything but a sincere and devout practitioner of Islam.

Ms. Forde's desire to live in harmony with Islamic principles limiting male-female physical contact to immediate family members need not be universal among the Muslim community in order to be legally significant, as long as her beliefs are religious in nature.  *Forde*, 612 F. Supp. 2d at 179 ("[T]he Second Circuit has held that the prohibition of a religious practice may be a substantial burden even if the practice is not mandated") (citing *Ford v. McGinnis*, 352 F.3d 582, 593 (2d. Cir. 2003)); *see also McEachin v. McGinnis*, 357 F.3d 197, 203 (2d Cir. 2004) ("[A] requirement that a religious practice be mandatory to warrant First Amendment protection finds no support in the cases of the Supreme Court or of this court"); *Patrick v. LeFevre,* 745 F.2d 153, 158 (2d Cir. 1984) ("[I]mpulses prompted by dictates of conscience as well as those engendered by divine commands are therefore safeguarded against secular intervention, so long as the claimant conceives of the beliefs as religious in nature").[17] Similarly, RFRA does not call for the Court to assess whether Ms. Forde's beliefs are theologically legitimate or even logical; so long as they are sincere, her beliefs are entitled to protection under RFRA.  *McEachin* 357 F.3d at 201 (quoting *Hernandez v. Comm'r,* 490 U.S. 680, 699 (1989) (stating that to "question . . . the validity of particular litigants' interpretations of [their] creeds" is "not within the judicial ken")); *see also Jolly*, 76 F.3d at 476 ("[C]ourts are not permitted to

---

[17]    Other circuits have similarly held.  *See Levitan v. Ashcroft,* 281 F.3d 1313, 1322 (D.C. Cir. 2002) ("The fact that some other Catholics only consume the species of bread is not dispositive, nor are the statements of clergy that the taking of wine by congregants is not a mandatory element of the ritual.").

ask whether a particular belief is appropriate or true—however unusual or unfamiliar the belief may be.").

Although Ms. Forde need not prove that her beliefs are shared by others, the evidence presented at trial by Dr. Emon and Imam Hamidullah grounding Ms. Forde's beliefs in the Islamic tradition is probative of the sincerity of Ms. Forde's belief that being pat searched by men profanes her Islamic values.  Specifically, the evidence that Ms. Forde's beliefs are widely shared and based in Islamic text corroborates Ms. Forde's own testimony that her reading of the Qur'an and conversations with other Muslims provided the basis for her belief that being pat searched by male staff contravenes the dictates of her faith.  (Forde, Tr. Vol. 1, 10:21-24; 50:11-53:1; Emon, Tr. Vol. 1, 98:24-99:12; Hamidullah, Tr. Vol. 3, 29:23-30:11; 47:16-23).   The sincerity of the religious basis underlying Ms. Forde's claim is also corroborated by Imam Hamidullah's testimony that the duty to safeguard Islamic principles of modesty falls upon both Muslim women and men.  (Hamidullah, Tr. Vol. 3, 48:10-13).

## 2. Respondent's policy of subjecting Ms. Forde to routine pat searches by male staff is a substantial burden on her religious exercise.

When analyzing religious exercise claims, the Second Circuit has stated that "demonstrating . . . a [substantial] burden is not a particularly onerous task."  *McEachin*, 357 F.3d at 202; *Singh v. Goord,* 520 F. Supp. 2d 487, 498-99 (S.D.N.Y. 2007); *see also Shakur v. Selsky,* 391 F.3d 106, 120 (2d Cir. 2004) (reversing district court and holding that single denial of a religious meal was enough to constitute a "substantial burden"). The evidence presented at trial is more than sufficient to make this showing.

It is well-established that the state burdens an inmate's exercise of religion when it "require[s] a believer to defile [her]self by doing something that is . . . forbidden by [her]

religion." *Ashelman v. Wawrzaszek*, 111 F.3d 674, 677 (9th Cir. 1997); *see also Singh,* 520 F. Supp. 2d at 505 (holding that where inmate's beliefs mandated that religious scriptures be kept in clean elevated area, prison officials imposed a "substantial burden" by packing them with shoes and undergarments); *McEachin*, 357 F.3d at 204-05 ("[I]nmates have a right not to be disciplined for refusing to perform tasks that violate their religious beliefs"); *Hayes v. Long*, 72 F.3d 70 (8th Cir. 1995) (holding that Muslim plaintiff has a clearly established right to refuse to handle pork). Respondent has placed such a burden on Ms. Forde's religious exercise by repeatedly subjecting her to physical touching by men outside her family, which is forbidden in Islam.  *Cf. Jean-Laurent v. Wilkerson,* 438 F. Supp. 2d 318, 324 (S.D.N.Y. 2006) (repeated strip searches of inmate imposed substantial burden on his religious belief that he should not be seen naked by strangers).

A "substantial burden" is placed on an inmate when a prison regulation limits or interferes with her religious observance. *McEachin,* 357 F.3d at 201 (holding that interrupting an inmate's prayers imposes a substantial burden); *Nelson v. Miller,* 570 F.3d 868, 877-80 (7th Cir. 2009) (finding that the denial of sufficiently nutritious non-meat diet during Lent was a "substantial burden" on inmate's religious avoidance of eating meat under RFRA);  *Love v. Reed,* 216 F.3d 682, 689 (8th Cir. 2000) (concluding that prison regulations "detracting from the joy" of observing Sabbath imposed a "substantial burden" on inmate's religious beliefs); *Makin v. Colorado Dept. of Corrections*, 83 F.3d 1205, 1213 (10th Cir. 1999) (finding that meal schedule interfering with "the religious experiential aspects of Ramadan" was a substantial burden even if inmate managed to successfully fast by hoarding food).

This Court has already held, and Respondent conceded at summary judgment, that regular application of Respondent's policy substantially burdens Ms. Forde's religious beliefs.

*Forde*, 612 F. Supp. 2d at 177 ("Respondent concedes that regular cross-gender pat-down searches would place a substantial burden on Petitioner's exercise of her religion, and the court agrees.").   At trial, Ms. Forde presented ample evidence demonstrating that Respondent has substantially burdened her religious exercise through regular pat searches by men.   Ms. Forde testified about numerous pat searches by male staff in the presence of available female staff, including one incident that took place during Ramadan, a religious holiday.  (Forde, Tr. Vol. 1, 39-41).   She further testified that Respondent has persisted in pursuing a policy of regularly subjecting her to pat searches by male staff despite her repeated requests that she be searched by a woman out of respect for her religious beliefs. (Forde, Tr. Vol. 1,13:14-24; 41:19-25; 42:17-21; 43:4-20). Ms. Forde testified that on approximately 50 percent of the occasions when she requested that she be pat searched by female rather than male staff, Respondent refused to have a female search her. (Forde, Tr. Vol. 1, 58:10-13).   At trial, Respondent provided no evidence contesting the existence of this policy or its regular application to Ms. Forde.  (*See* Ex. J).

A substantial burden also exists where the state "'puts substantial pressure on an adherent to modify his behavior and to violate his beliefs.'"  *Forde*, 612 F. Supp. 2d at 177 (quoting *Jolly*, 76 F.3d at 477 (quoting *Thomas v. Review Bd. of the Indiana Employment Sec. Div*., 450 U.S. 707, 718 (1981))).   By regularly ordering Ms. Forde to submit to routine pat searches by male staff, and by refusing to give her an individual exemption from such searches, Respondent has put "substantial pressure" on Ms. Forde to violate her beliefs.   The substantial pressure placed on Ms. Forde is highlighted by Respondent's response to Ms. Forde's request to be searched by a female officer in 2008: Respondent not only repeatedly refused Ms. Forde's request, but then ordered her to submit to a strip search and placed her in the Special Housing Unit. (Forde, Tr. Vol. 1, 19-23; s*ee also* Ex. T).  The evidence establishes that Respondent has both "pressure[d]

[Ms. Forde] to significantly modify her behavior" and "significantly violate[d] [her] religious belief[]" that she should not be touched by males outside of her immediate family.   *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004); *see also Williams v. Bitner*, 359 F. Supp. 2d 370, 375-76 (M.D. Pa. 2005) (requiring Muslim inmate to handle pork and sanctioning him with cell restriction when he refused could constitute a substantial burden under RLUIPA).[18]

### B.  Respondent Has Failed To Meet Its Burden Under RFRA.

Because Ms. Forde has met her initial burden under RFRA by proving that Respondent's routine pat searches by male staff substantially burden her exercise of religion, the burden shifts to Respondent to demonstrate that its refusal to grant her an individual exemption from this policy "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. §§ 2000bb-1(b).  This is a high burden, and Respondent has failed to meet it.  *See Forde*, 612 F. Supp. 2d at 178.  *Cf. Crawford v. Clarke,* 578 F.3d 39, 43 (1st Cir. 2009) (affirming RFRA injunction mandating broadcast of Friday prayer service to inmates in SHU because government failed to meet its burden).

### 1.  Respondent's refusal to grant Ms. Forde an individual exemption from routine pat searches by male staff does not further any compelling governmental interest.

"RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened."  *O Centro Espirita*, 546 U.S. at 430-31 (quoting 42 U.S.C. § 2000bb-1(b)).  In applying the test, the Court must "look[]

---

[18]     The term "substantial burden" appears in both RFRA and its state analogue, the Religious Land Use and Institutionalized Persons Act ("RLUIPA").  As this Court previously noted, "[g]iven use of the same term of art, there is no reason to treat "substantial burden" any differently under RFRA than RLUIPA."  *Forde,* 612 F. Supp. 2d at 177 n.2.

beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *Id.* at 431.[19]   Accordingly, in order to sustain its burden under RFRA, Respondent must make a specific showing that denying Ms. Forde an *individual exemption* from non-emergency pat searches by male staff further a compelling governmental interest.

Respondent suggests that denying Ms. Forde the individual exemption she seeks implicates two potential governmental interests: ensuring prison security and avoiding employment problems. (Cantor, Tr. Vol. 2, 51:13-18; Zickefoose, Tr. Vol. 2, 160:24-161:11, 165:8-20; Respondent's Closing Argument, Tr. Vol. 4, 40:1-7, 42:5-15; 45:11-46:7).   Although Ms. Forde does not dispute that, under certain specific circumstances, security and employment concerns may constitute compelling interests, Respondent has failed to prove that denying Ms. Forde an individual exemption furthers either of these interests.   On the contrary, there is no evidence before this Court that substantiates "the asserted harm" that Respondent claims would result from "granting [this] specific exemption[]" to Ms. Forde. *O Centro Espirita*, 546 U.S. at 431.

> a) **Respondent's refusal to grant Ms. Forde an individual exemption from routine pat searches by male staff does not further the government's asserted security interest.**

Although security has been described as an important institutional concern within the context of prison administration, "prison officials cannot simply use the words 'security' and

---

[19]    In *O Centro Espirita*, a religious sect brought suit under RFRA to secure a preliminary injunction to uphold the sect's use of a hallucinogenic tea for sacramental purposes.   In a unanimous decision by Chief Justice Roberts, the Supreme Court found for the plaintiffs.   The Court held that RFRA places the burden on the government to demonstrate a compelling interest, and rejected the government's argument that its asserted compelling interests required application of the Controlled Substance Act without an exception for the sect. *O Centro Espirita*, 546 U.S. at 430-31 ("RFRA, and the strict scrutiny test it adopted, contemplate an inquiry more focused than the Government's categorical approach.").

'safety,' and expect that their conduct will be permissible." *Singh v. Goord*, 520 F. Supp. 2d 487, 499 (S.D.N.Y. 2007) (citing *Jolly,* 76 F.3d at 479); *see also Jova v. Smith*, 582 F.3d 410, 415 (2d Cir. 2009) ("[T]he state may not merely reference an interest in security or institutional order in order to justify its actions; rather, the particular policy must further this interest, and must be more than conclusory" (citations omitted)).  The Second Circuit recently observed that, "[w]here a circuit court has found that [the government's] identified interest was insufficiently compelling, this was often based on the court's observation that the [government] failed to provide sufficient evidence explaining how the practices at issue furthered the stated interest." *Jova*, 582 F.3d at 415 (citing *Spratt v. R.I. Dep't of Corr.*, 482 F.3d 33, 38-41 (1st Cir. 2007); s*ee also Lovelace v. Lee*, 472 F.3d 174, 190-91 (4th Cir. 2006)).  An examination of the evidentiary record before this Court reveals that Respondent has in fact failed to prove that denying Ms. Forde an exemption from non-emergency pat searches by male staff furthers the asserted security interest.

Respondent has already granted inmates the individual exemption that Ms. Forde seeks, without any deleterious consequences.  Testimony revealed that Respondent has granted exemptions from routine pat searches by male staff to at least two inmates since 1999. (Zickefoose, Tr. Vol. 2, 181:11-20; Miller, Tr. Vol. 1, 201:13-17).  Neither Warden Zickefoose, who served as the prison's chief administrator during part of the time when these exemptions were in place, nor the correctional experts called by Ms. Forde and Respondent were able to identify any specific negative impact on prison security that resulted from these exemptions. (Zickefoose, Tr. Vol. 2, 182:5-183:11; Cantor, Tr. Vol. 2, 136:18-22; Miller, Tr. Vol. 1, 202:1-18).  The fact that Respondent has already housed at least two inmates who were exempt from routine cross-gender pat searches without experiencing any identifiable problems is compelling

evidence that granting Ms. Forde a similar individual exemption would not adversely affect security.

Respondent also exempts all female inmates from routine visual searches by male staff, with no adverse consequences. (Miller, Tr. Vol. 1, 169:17-19; Zickefoose, Tr. Vol. 2, 185:20-23). Like visual searches, the "vast majority" of pat searches at FCI Danbury are performed at predictable times and locations. (Cantor, Tr. Vol. 2, 85:19-21; Miller, Tr. Vol. 1, 218:23-219:2; s*ee also* Miller, Tr. Vol. 1, 140:14-141:1; Zickefoose, Tr. Vol. 2, 180:22-181-7). Respondent already requires that every non-emergency visual search of all inmates be conducted by female staff; a similar individual requirement regarding non-emergency pat searches of Ms. Forde would have little, if any, additional impact. (*See* Miller, Tr. Vol. 1, 171:14-20; 174:22-175:14; Zickefoose, Tr. Vol. 2, 179:7-180:2 (feasibility of calling female officers); *see also* Miller, Tr. Vol. 1, 173:1-8 (testifying that the compound takes no more than five minutes to traverse)).

Respondent's assertion that denying Ms. Forde an exemption advances Respondent's security interest was further undermined by evidence that routine pat searches of female inmates by male staff diminish institutional security. Exposing male staff to allegations of misconduct discourages male staff from performing complete and thorough searches, and each allegation drains institutional resources by requiring staff reassignment and investigation. (Miller Tr. Vol. 1, 191:4-192:14; *see also* Ex. E, at 26 ("BOP officials believed that male staff members were most often accused of sexual misconduct stemming from pat searches.")).

Furthermore, the overwhelming number of prison systems in the United States maintain security without permitting any routine pat searches of female inmates by male staff. As Mr. Miller testified and various exhibits confirmed, the BOP is "almost a lone holdout" among U.S. correctional systems in continuing to permit male staff to pat search female inmates routinely.

(Miller, Tr. Vol. 1, 205:23-206:3; *see also* Exs. G, H, I, AA, and BB).   The decision by more than 40 states to prohibit male staff from routinely pat searching female inmates has not undermined security in those correctional systems.   (Miller, Tr. Vol. 1, 190:9-23).   Respondent introduced no evidence indicating that its security interests are materially different from those of other correctional systems in the United States.

> **b) Respondent's refusal to grant Ms. Forde an individual exemption from routine pat searches by male staff does not further the government's asserted employment interest.**

Although Respondent has suggested that its interest in avoiding employment problems justifies its pat search policy under RFRA, it fails to articulate any specific details about this alleged employment concern.   A vague claim of employment problems cannot be considered a compelling government interest.   Moreover, Respondent failed to establish any credible connection between denying Ms. Forde an exemption from routine pat searches by male staff and the governmental interest in avoiding employment problems.   Warden Zickefoose did not identify any negative impacts on employment that resulted from the individual pat search exemptions that were in place during her tenure at FCI Danbury.   (Zickefoose, Tr. Vol. 2, 182:9-183:12).   Furthermore, Respondent put on no evidence to suggest that granting Ms. Forde an individual exemption would require Respondent to reassign staff members using gender as a criterion.   On the contrary, the fact that the institution already prohibits routine visual searches by male staff suggests that gender-based reassignment of the staff would not be required in order to accommodate an individual pat search exemption.   (*See* Miller, Tr. Vol. 1, 169:17-19; Zickefoose, Tr. Vol. 2, 185:20-23).

Even assuming, *arguendo*, that granting Ms. Forde the relief she seeks would require Respondent to reassign staff members on the basis of gender, this would not violate the Master

Agreement governing labor relations between Respondent and the corrections officers' union. (Ex. K; Ex. 25; Miller, Tr. Vol. 1, 167:10-18); *see also American Federation of Government Employees Local 3584 (Union) and U.S. DOJ Federal BOP FCI Dublin, Calif. (agency)*, 58 F.L.R.A. 473 (2003) (holding that assigning a female employee to a particular assignment does not violate the Master Agreement, even though a male employee with seniority had requested that assignment, as long as the decision is not arbitrary).[20]   Respondent has therefore failed to meet its burden under RFRA of proving that denying Ms. Forde an individual exemption furthers a compelling government interest in employment.

> **2.  Respondent's refusal to grant Ms. Forde an individual exemption from routine pat searches by male staff is not the least restrictive means of furthering the governmental interests identified by Respondent.**

Assuming, *arguendo*, that Respondent had established that denying Ms. Forde an individual exemption from routine pat searches by male staff furthers the government's interests in security or employment, it has certainly not met its second burden under RFRA of proving that denying this exemption is the least restrictive means of furthering either of those interests.

---

[20]      It also bears noting that reassigning staff on the basis of gender, if that were necessary, would also not violate Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e *et seq.*  In the prison context, an employer's reasonable gender-based job assignment policy will be upheld if it imposes only a "minimal restriction" on employees. *Timm v. Gunter*, 917 F.2d 1093, 1102 n.13 (8th Cir. 1990).  Gender-based assignment of shifts, even where it prevents corrections staff from selecting preferred assignments, is a "minimal restriction." *Tipler v. Douglas County*, 482 F.3d 1023, 1027 (8th Cir. 2007); *Robino v. Iranon*, 145 F.3d 1109, 1110 (9th Cir. 1998); *Tharp v. Iowa Dep't of Corrections*, 68 F.3d 223, 226 (8th Cir. 1995) (en banc), *cert. denied* 517 U.S. 1135 (1996).

a) **Respondent's refusal to grant Ms. Forde an individual exemption from routine pat searches by male staff is not the least restrictive means of meeting Respondent's asserted security interest.**

Respondent has readily available means to meet FCI Danbury's alleged security and employment interests in a manner that is less restrictive of Ms. Forde's religious exercise than its current policy: granting Ms. Forde an individual exemption from routine pat searches by male staff. Respondent already has a policy in place that would provide the precise relief Ms. Forde seeks. It is an undisputed fact that Respondent has already granted at least two individual exemptions from routine pat searches by male staff. (Miller, Tr. Vol. 1, 201:13-17; Zickefoose, Tr. Vol. 2, 181:11-20). Neither Warden Zickefoose nor Ms. Cantor, Respondent's security expert, could identify any deleterious effects resulting from these exemptions. (Zickefoose, Tr. Vol. 2, 182:5-183:11; Cantor, Tr. Vol. 2, 136:18-22). Mr. Miller, Ms. Forde's correctional expert, testified that implementing this exemption would have no detrimental effect on Respondent's security or orderly running of the institution, further supporting the availability and feasibility of this less restrictive alternative. (Miller, Tr. Vol. 1, 201:13-16).

The ability of more than 40 other correctional systems to maintain security without routine pat searches of female inmates by male staff provides additional proof that denying Ms. Forde the exemption she seeks is not the least restrictive means of furthering the interest of security at FCI Danbury. (Miller, Tr. Vol. 1, 190:9-23, 205:23-206:3; *see* Exs. G, H, I, AA, and BB). The Second Circuit recently stated that, "other circuits have observed that 'the failure of a defendant to explain why another institution with the same compelling interests was able to accommodate the same religious practices may constitute a failure to establish that the defendant was using the least restrictive means.'" *Jova v. Smith*, 582 F.3d 410, 416 (2d Cir. 2009) (quoting *Warsoldier v. Woodford*, 418 F.3d 989, 1000 (9th Cir. 2005)). In this vein, the fact that that BOP

is "almost a lone holdout" among U.S. correctional systems in continuing to permit the routine

pat searching of female inmates by male staff—a practice that Ms. Forde sincerely believes

violates her religion—"constitute[s] a failure to establish that [Respondent] [is] using the least

restrictive means" of furthering the government's security interest.  *Id.*

> **b) Respondent's refusal to grant Ms. Forde an individual exemption from routine pat searches by male staff is not the least restrictive means of meeting Respondent's asserted employment interest.**

Respondent failed to introduce any evidence of a connection between Ms. Forde's

request for an individual exemption from routine pat searches by male staff and the asserted

interest in avoiding employment problems.  It cannot, therefore, meet its burden of establishing

that denying this exemption is the least restrictive means of furthering this interest.

> **C. Because Respondent's Policy Violates RFRA, This Court Need Not Reach The Constitutional Question.**

As described above, if the Court finds that Respondent's refusal to grant Ms. Forde an

individual exemption from being pat searched by men violates RFRA, it need not consider

whether this refusal also violates the First Amendment.  *See* note 16, *supra*.  Nevertheless, Ms.

Forde has alleged, and the evidence at trial has shown, that Respondent's policy in fact also

violates her right to free exercise of religion guaranteed by the First Amendment.  Ms. Forde's

constitutional arguments are described below.

## II.   RESPONDENT'S POLICY OF SUBJECTING MS. FORDE TO ROUTINE PAT SEARCHES BY MALE STAFF VIOLATES THE FIRST AMENDMENT.

Under Second Circuit precedent, when considering a First Amendment free exercise

claim brought by a prisoner, the court must make three determinations:

(1) whether the practice asserted is religious in the person's scheme of beliefs, and whether
the belief is sincerely held; (2) whether the challenged practice of the prison officials

infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological objective.

*Forde*, 612 F. Supp. 2d at 180 (citing *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988)).

As with RFRA, the free exercise test involves a shifting burden. Although the initial burden rests with Ms. Forde to demonstrate that her religious belief is sincerely held and that the prison's practice infringes upon her belief, the government must then articulate a legitimate penological objective that justifies this infringement. *See Ford v. McGinnis*, 352 F.3d 582, 596 (2d Cir. 2003) ("*[O]nce prison officials put forward a legitimate penological interest* to justify an infringement upon a prisoner's religious free exercise, the burden remains with the prisoner to 'show that these [penological] concerns were irrational.'") (emphasis added) (quoting *Fromer v. Scully,* 874 F.2d 69, 74 (2d Cir. 1989)); *see also Figel v. Overton*, 121 Fed.Appx. 642, 646 n.2 (6th Cir. 2005) ("We note that while the burden is on the prisoner to disprove the validity of the regulation at issue . . . Defendants must still articulate their interest in the regulation . . . Otherwise, a prisoner would be forced to hypothesize any number of potential legitimate penological interests and then disprove a reasonable relationship between each and the regulation at issue.").

If and when the government articulates a legitimate penological objective, the Court must determine whether the challenged policy actually furthers that legitimate penological objective. *See Turner v. Safley,* 482 U.S. 78, 89-90 (1987). As explained by the Second Circuit, *Turner* requires the Court to decide:

(i) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (ii) whether there are alternative means of exercising the right in question that remain open to prison inmates; (iii) whether accommodation of the asserted constitutional right will have an unreasonable impact upon guards and other inmates, and upon the allocation of prison resources generally; and (iv) whether there are reasonable alternatives available to the prison authorities.

*Forde*, 612 F. Supp. 2d at 180 (citing *Covino v. Patrissi*, 967 F.2d 73, 78-79 (2d Cir. 1992) (citing *Turner,* 482 U.S. at 89-90)).

The evidentiary record before this Court clearly demonstrates that Respondent's refusal to grant Ms. Forde an individual exemption from routine pat searches by male staff infringes upon Ms. Forde's sincerely held religious beliefs.  Although Respondent has asserted that its refusal to grant the exemption furthers two legitimate penological interests—security and employment—Ms. Forde has demonstrated that the policy in fact does not further these purported interests.  Respondent accordingly fails at the third step of the *Turner* test, and Ms. Forde is therefore entitled to relief on her First Amendment claim.

### A. Respondent's Policy of Subjecting Ms. Forde to Routine Pat Searches by Men Infringes Her Sincerely Held Beliefs.

The evidentiary record described above in "Facts Established at Trial," regarding Ms. Forde's RFRA claim, establishes that Respondent's refusal to grant Ms. Forde an exemption from routine pat searches by male staff infringes upon Ms. Forde's sincerely held religious beliefs.  *See supra* at 4-15; *see also Forde*, 612 F. Supp. 2d at 180; *Ward v. Walsh,* 1 F.3d 873, 878 (9th Cir.1993) (stating that, "to require a believer to defile himself, according to the believer's conscience, by doing something that is completely forbidden by the believer's religion" is an infringement of her First Amendment rights.).

### B. Respondent's Refusal to Grant Ms. Forde an Individual Exemption From Routine Pat Searches by Male Staff Does Not Further Any Legitimate Penological Objective.

Respondent asserts that denying Ms. Forde the individual exemption she seeks furthers two legitimate penological objectives: maintaining prison security and avoiding employment problems. (Cantor, Tr. Vol. 2, 51:13-18; Zickefoose, Tr. Vol. 2, 160:24-161:11, 165:8-20; Respondent's Closing Argument, Tr. Vol. 4, 40:1-7, 42:5-23; 45:11-46:7).  Although Ms. Forde

does not dispute that, under certain specific circumstances, security and employment may constitute legitimate penological objectives, denying Ms. Forde's individual exemption from routine pat searches by male inmates actually does not further either of these objectives, as *Turner* requires.

> **1. There is no valid, rational connection between a policy imposing routine pat searches by male staff on female inmates and an interest in either institutional security or employment problems.**

The first prong of the *Turner* test asks "whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Forde*, 612 F. Supp. 2d at 180. The evidence presented at trial demonstrates that there is no such connection between Respondent's policy of allowing routine pat searches by male staff and either of its asserted legitimate governmental interests. *See Beerheide v. Suthers,* 286 F.3d 1179, 1189 (10th Cir. 2002) ("In order to warrant deference, prison officials *must present credible evidence* to support their stated penological goals.") (emphasis in original).

First, there is no valid, rational connection between the Respondent's asserted interest in avoiding employment problems at FCI Danbury and its policy of permitting routine pat searches of female inmates by male staff.  The Master Agreement between the officers' union and Respondent governing labor relations at FCI Danbury does not contain any language prohibiting Respondent from allowing only female staff to pat search Ms. Forde. (Ex. K; Ex. 25; Miller Tr. Vol 1, 167:10-18).  In fact, Respondent already takes gender into account regarding staff tasks, as male staff are prohibited from routinely performing visual searches of female inmates.  (Ex. J; *see also* Zickefoose, Tr. Vol. 2, 185:20-23; Miller Tr. Vol 1, 169:17-19).  Respondent has effectuated this prohibition on male staff conducting routine *visual* searches of inmates without

violating any of its employment obligations.  (Exhibit K; Ex. 25; *see also* Zickefoose Tr. Vol. 2, 186:12-190:11).

Second, there is no valid, rational connection between the Respondent's asserted interest in maintaining security and its policy of subjecting Ms. Forde to routine pat searches by male staff.  Allowing male staff to routinely pat search women does not further institutional security, and may in fact undermine that interest.  *See supra* at Section I.B.1.a (pages 23-26).

Finally, the fact that most prison systems in the United States maintain security without permitting male staff to routinely pat search female inmates flouts Respondent's contention that a valid, rational relationship exists between the routine pat search policy and the asserted interest in institutional security at FCI Danbury. (Miller, Tr. Vol. 1, 190:9-23).

### 2. Ms. Forde has no effective alternative means of exercising the right to abide by Islam's prohibition on physical contact with men outside of her family.

The second *Turner* factor asks the court to examine "whether there are alternative means of exercising the right in question that remain open to prison inmates."  *Forde*, 612 F. Supp. 2d at 180.  Prison policies "must leave 'effective' means for 'substitutable' exercises of expression." *Shakur v. Selsky*, 391 F.3d 106, 114 (2d Cir. 2004).  Ms. Forde has no alternative means to exercise her right to adhere to her religion's prohibition on touching by men outside of her immediate family other than through an individual exemption.

As an observant Muslim, Ms. Forde believes that the Qur'an prohibits her from being touched by members of the opposite sex who are not members of her immediate family.  (Forde, Tr. Vol. 1, 10:21-24; 28:1-3; 34:1-2).  Respondent's current policies provide Ms. Forde with no "effective" and "substitutable" means of exercising her right to live in accordance with this belief. *Shakur,* 391 F.3d at 114.

Ms. Forde is pat searched by men even when she identifies herself as a Muslim,  (Forde, Tr. Vol. 1, 43:12-16), even when she requests to be searched by a woman instead, (Forde, Tr. Vol. 1, 58:6-13), and even after making such requests to superior officers in charge of her unit. (Forde, Tr. Vol. 1, 43:21-44:1; *see also* Ex. U).  Ms. Forde's attempts to alternatively follow her religion's dictates by requesting to be pat searched by women are ineffective because Respondent routinely ignores her requests for religious accommodation.  On one occasion, her request to be searched by a female prompted a strip search and placement in SHU for disobeying a direct order.  (Forde, Tr. Vol. 1, 19:17-23:22; *see also* Ex. T).

Ms. Forde has repeatedly stated in administrative remedies directed to Respondent that it is a violation of her religion to be subjected to routine pat searches by male staff.  (Exs. N, O, P, Q, R, and S).  Even though Ms. Forde has fully grieved the issue on more than one occasion, she continues to be subjected to routine pat searches by male staff.  (Forde, Tr. Vol. 1, 30:11-19; 35:9-13; 38:22-39:5).  Ms. Forde's use of the administrative grievance system to object to the burden placed on her religious practice is therefore an inadequate alternative to the freedom to exercise her religious belief in not being touched by men outside of her immediate family.  These administrative grievances are nothing more than an avenue for her to protest the ongoing absence of a means for her to freely practice her beliefs.

Moreover, although Ms. Forde testified that she participates in religious celebrations at FCI Danbury and that she receives accommodation of her dietary restrictions, (Forde, Tr. Vol. 1, 60:7-25), these accommodations are not an effective substitute for Ms. Forde's ability to practice her belief in religious modesty.  They are, indeed, entirely unrelated to that practice.  A Catholic forced to eat meat on Fridays during Lent would not find permission to attend church on Sunday an effective substitute or accommodation of her belief.  Similarly, an accommodation of an

entirely unrelated aspect of Ms. Forde's faith does not provide her with any alternate means of practicing her belief not to be touched by men outside of her family. A Ramadan fast does not satisfy the *mahram* obligation any more than eating Kosher food satisfies the requirement to observe Yom Kippur. *See Benjamin* v. *Coughlin*, 905 F.2d 571, 578 (2d Cir. 1990) (inquiring, under second *Turner* prong, whether inmates denied weekly religious observance had "alternative means of . . . congregate prayer" rather than whether they had means of practicing other facets of their religion generally); *Greene v. Solano County Jail*, 513 F.3d 982, 987 (9th Cir. 2008) (holding that, under RLUIPA, which applies same strict scrutiny test as RFRA, "the religious exercise at issue…is not [the] ability to practice [one's] religion as a whole" but the ability to practice "a particular facet of [one's] religious practice.") (quoting *San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024 (9th Cir. 2004)).

> **3. Accommodating Ms. Forde's First Amendment rights by granting her an individual exemption from routine pat searches by male staff would not have an unreasonable impact on guards, inmates, or the allocation of prison resources.**

The third *Turner* factor asks the court to examine "whether accommodation of the asserted constitutional right will have an unreasonable impact upon guards and other inmates, and upon the allocation of prison resources generally." *Forde*, 612 F. Supp. 2d at 180. Ms. Forde has demonstrated that providing her with an individual exemption from routine pat searches by male staff will not have an unreasonable impact.

The evidence introduced at trial demonstrates that the "vast majority" of pat searches at FCI Danbury occur at predictable times and in predictable places, such as after meals in the dining hall and at closing time outside of work areas. (Cantor, Tr. Vol. 2, 85:19-21; Miller, Tr. Vol. 1, 218:23-219:2; *see also* Miller, Tr. Vol. 1, 140:14-141:1; Zickefoose, Tr. Vol. 2, 180:22-181:7; Forde, Tr. Vol. 1; 28:4-13). This predictability provides proof that accommodating an

individual exemption for Ms. Forde will not unreasonably (or even significantly) impact the allocation of prison resources.

Additionally, providing a female staff member to perform a pat search of Ms. Forde would not be unduly burdensome for Respondent.  FCI Danbury correctional officers carry handheld radios and can be readily summoned if a female staff member is not in the immediate area when a search is required. (Miller, Tr. Vol. 1, 171:14-20, 173:1-8).   The fact that Respondent requires female staff to conduct routine visual searches, (Miller, Tr. Vol. 1, 169:17-19; Zickefoose, Tr. Vol. 2, 185:20-23), along with the fact that almost all U.S. prisons maintain security and order without routine pat searches of female inmates by male staff, (Miller, Tr. Vol. 1, 190:9-23), demonstrates that providing Ms. Forde with an individual exemption would not adversely impact institutional resources.

Furthermore, Respondent has already granted at least two individual exemptions from routine pat searches by male staff, and has identified no deleterious effects on guards, inmates, or the allocation of prison resources resulting from these exemptions.  (Miller, Tr. Vol. 1, 201:13-17; Zickefoose, Tr. Vol. 2, 181:11-20, 182:5-183:11; Cantor, Tr. Vol. 2, 136:18-22).

### 4. Granting Ms. Forde an individual exemption from routine pat searches by male staff is a reasonable alternative available to Respondent.

The fourth prong of the *Turner* test asks "whether there are reasonable alternatives available to the prison authorities." *Forde*, 612 F. Supp. 2d at 180.   "The Court in *Turner* stated in conclusion that 'if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.'" *Pugh v. Goord*, 571 F. Supp. 2d 477, 494-95 (S.D.N.Y. 2008) (quoting *Turner,* 482 U.S. at 91).   "'The

degree to which the cost of [an alternative] is burdensome is an issue of fact.'" *Shakur v. Selsky*, 391 F.3d 106, 114 (2d Cir. 2004) (quoting *Allen v. Coughlin*, 64 F.3d 77, 81 (2d Cir. 1995)). The evidence presented at trial demonstrates that granting Ms. Forde an individual exemption to routine pat searches by male staff presents a ready alternative to the current practice at FCI Danbury.  This alternative fully accommodates her First Amendment rights at no cost to valid penological objectives.

The availability and acceptability of this alternative are demonstrated by Respondent's existing policy of exempting some female inmates from routine pat searches by male staff. Respondent has already granted at least two such exemptions.  (Miller, Tr. Vol. 1, 201:13-17; Zickefoose, Tr. Vol. 2, 181:11-20).  The existence of these exemptions proves that the denial of an individual exemption to Ms. Forde is an "'exaggerated response' to prison concerns" and that this response is unreasonable in light of the readily available alternatives.  *Turner*, 482 U.S. at 90 ("[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns.").

Furthermore, the fact that Respondent virtually alone among U.S. correctional systems in continuing to permit male staff to routinely pat search female inmates demonstrates that reasonable alternatives exist, and, in fact, are flourishing.  (Miller, Tr. Vol. 1, 205:16-206:3; Ex. G).  The decision by more than 40 states to prohibit male staff from routinely pat searching female inmates has not undermined security in those correctional systems, and the Respondent has put forth no evidence to suggest that its experience would be any different.  (Miller, Tr. Vol. 1, 190:9-23; *see Jova v. Smith*, 582 F.3d 410, 416 (2d Cir. 2009) (citation omitted)).

## CONCLUSION

For the foregoing reasons, Ms. Forde respectfully requests that the Court grant her petition for writ of habeas corpus and issue a conditional release order.

Respectfully Submitted,

_____/s/_____
Brett Dignam, ct00283

_____/s/_____
Sarah French Russell, ct26604

_____/s/_____
Scott L. Shuchart, ct27991

Jerome N. Frank Legal Services Organization
P.O. Box 209090
New Haven, CT 06520-9090
(203) 432-4800 phone
(203) 432-1426 fax
brett.dignam@yale.edu
sarah.russell@yale.edu
scott.shuchart@yale.edu
*Counsel for Petitioner.*

On the Brief:
Megan Quattlebaum
Robert Silverman
Avi Springer
Adrienna Wong
Law Student Interns

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of this Brief was e-filed this 19th day of February, 2010, with electronic notification sent to:

Assistant U.S. Attorney Alan Soloway
U.S. Attorney's Office – New Haven
157 Church St., 23rd floor
New Haven, CT 06510

Assistant U.S. Attorney Michelle McConaghy
U.S. Attorney's Office – New Haven
157 Church St., 23rd floor
New Haven, CT 06510


_____/s/_____
Brett Dignam
Jerome N. Frank Legal Services Organization
Yale Law School
P.O. Box 209090
New Haven, CT 06520
Bar No.: ct00283
brett.dignam@yale.edu