UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BEVERLEY FORDE, | : | |
| | : | |
| Petitioner, | : | |
| | : | |
| v. | : | CIVIL NO. 3:03CV1424(EBB)(JGM) |
| | : | |
| MAUREEN BAIRD, | : | |
| Warden, FCI  Danbury, | : | |
| | : | |
| Respondent. | : | February 19, 2010 |

**PETITIONER'S POST-TRIAL FINDINGS  OF FACT AND CONCLUSIONS OF LAW**

Petitioner Beverley Forde respectfully submits Proposed Findings of Fact and Conclusions of Law in the above-captioned case, following the bench trial held from December 14 to December 17, 2009.   All citations in the Proposed Findings of Fact are to the trial transcript.

**A.  Proposed Findings of Facts**

*Ms. Forde's Faith*

1.  Ms. Forde has been a religiously observant Sunni Muslim since she converted to Islam in 1993.[1]

2.  Ms. Forde has been in the custody of Respondent and her predecessors since 1996.[2]

3.  Ms. Forde has been an observant Sunni Muslim while in Respondent's custody at FCI

---

[1] Forde, Tr. Vol. 1, 7:20-8:23; 37:6-14; 69:4-12; Ex. R.
[2] Forde, Tr. Vol. 1, 11:19-20.

Danbury, from 1996 to the present.[3]

4.  Islam is a religion that dictates how an adherent should conduct her daily life, and identifies the appropriate means of pursuing daily practices, including diet, praying, ritual purity, and male-female relationships.[4]

5.  The Qur'an is a foundational holy book of the Islamic faith that sets forth the code of conduct "that speaks to how Muslims should govern themselves in this world as they live . . . their lives."[5]

6.  Ms. Forde sincerely believes that her religion requires her to organize her life according to the Qur'an, and she "live[s] [her] life to please [her] Lord and follow his rules and regulations."[6]

7.  Ms. Forde faithfully practices her religion by praying five times a day, observing the yearly month-long Ramadan fast, and consistently wearing the *hijab* (a head covering that is mandated by her faith).[7]

8.  One important requirement of Islam, consistent with the teachings of the Qur'an, is the prohibition of physical contact between a woman and men outside her *mahram* - the intimate circle of men composed of a woman's immediate family members.[8]

9.  Ms. Forde holds sincere religious beliefs prohibiting her from being touched by men who are not members of her immediate family.[9]

---

[3] Forde, Tr. Vol. 1, 7:20-8:4.
[4] Emon, Tr. Vol. 1, 96:15-25.
[5] Emon, Tr. Vol. 1, 94:15-21; 95:17-25.
[6] Forde, Tr. Vol. 1, 8:5-17; 33:10-18; Ex. P ( "I must obey my Lord."); *see also* Ex. R ( "[M]y religion is the main purpose of my life.").
[7] Forde, Tr. Vol. 1, 8:18-25; 9:19-10:2.
[8] Emon, Tr. Vol. 1, 98:22-99:14; Hamidullah, Tr. Vol. 3,  29:23-30:11; 47:16-23; Forde, Tr. Vol. 1, 9:3-9.
[9] Forde, Tr. Vol. 1, 10:21-24; 28:1-3; 34:1-2; 45:19-21; 50:22-24.

10. Ms. Forde sincerely believes that the duty to avoid touching members of the opposite sex outside one's immediate family falls upon both Muslim women and men.[10]

11. The touching of a Muslim woman by a man outside her immediate family may violate the tenets of Islam even if this contact is forced upon her.[11]

12. Ms. Forde sincerely believes routine pat searches by male staff violate the precepts of her faith.[12]

*Respondent's Pat Search Policy*

13. BOP Program Statement 5521.05 states that, "staff may conduct a pat search of an inmate on a routine or random basis to control contraband."[13]

14. When conducting a pat search, BOP staff use their hands to inspect an inmate's clothed body.[14]

15. During the pat search, an officer orders an inmate to loosen her belt, turn around, extend her arms, and spread her feet apart.[15]

16. During the pat search, the officer stands behind the inmate, and places his hands with palms flat against the inmate's body, feeling her collar, shoulders, arms, armpits, and torso.[16]

17. Officers are instructed to move their hands in a circular motion against the inmate's body during a pat search in order to ensure "maximum coverage."[17]

18. During a pat search, an officer places his hand between an inmate's breasts, runs his hand

---

[10] Forde, Tr. Vol. 1, 69:4-10; 70:1-17.
[11] Emon, Tr. Vol. 1, 116:12-17.
[12] Forde, Tr. Vol. 1, 13:1-7; 27:12-14; 33:4-9; 52:19-23; Ex. N; Ex. P.
[13] Ex. J, at 2.
[14] Forde, Tr. Vol. 1, 12:4-16; Zickefoose, Tr. Vol. 2, 154:11-21; Ex. J, at 2; Ex. 7.
[15] Ex. 27.
[16] Ex. 27.
[17] Ex. 27.

down the sternum to the underside of the breast, and circles his hand underneath her breast in an upward sweeping motion to the armpit area, where he applies pressure with the searching hand.[18]

19. During a pat search, an officer places his palm flat on the inmate's stomach and, beginning at the navel, runs his hand along the inmate's waistband.[19]

20. During a pat search, an officer places one hand on the inmate's crotch area, while simultaneously placing one hand flat against the inmate's buttock, and in one motion, runs both hands down her thigh and calf to the ankle.[20]

21. Respondent follows a random search policy that requires routine pat searches of female inmates by male staff.[21]

*Pat Searches of Ms. Forde*

22. Routine pat searches by male staff substantially burden the exercise of Ms. Forde's sincerely held religious beliefs.[22]

23. Ms. Forde was not pat searched by men at other BOP facilities prior to arriving at FCI Danbury.

    i. Ms. Forde was not pat-searched by male staff at MCC New York.[23]

    ii. Ms. Forde was not pat-searched by male staff at FCI Marianna.[24]

24. Ms. Forde has been subjected to repeated routine pat searches by male staff at FCI

---

[18] Ex. 27; Miller, Tr. Vol. 1, 131:23-132:6; Hamidullah, Tr. Vol. 3, 46:11-13.
[19] Ex. 27.
[20] Ex. 27.
[21] Ex. J; Miller, Tr. Vol. 1, 136:2-7; Zickefoose, Tr. Vol. 2, 151:14-23, 164:5-7.
[22] Forde, Tr. Vol. 1, 58:10-13; 30:12-19; 35:9-13; 38:22-25; 41:19-25; 49:1-5.
[23] Forde, Tr. Vol. 1, 13:25-14:1.
[24] Forde, Tr. Vol. 1, 14:2-3.

Danbury.[25]

25. Ms. Forde has been subjected to routine pat searches at FCI Danbury in the presence of available female prison staff.[26]

26. When Ms. Forde has requested that she be pat searched by a woman because of her religious beliefs, she has nonetheless been subjected to a search by a male officer.[27]

27. On October 7, 2004, Ms. Forde was ordered by a male officer to submit to a pat search as she was exiting the dining hall. When Ms. Forde requested that a woman perform the pat search, the male officer ordered her to wait until a female officer arrived.  When a female officer arrived, she escorted Ms. Forde to Special Housing Unit ("SHU"), strip-searched her and then admitted her to SHU for refusing an order.  Ms. Forde was not issued a disciplinary infraction, or ticket, for any violation of institutional policy.[28]

28. In 2007, Ms. Forde was subjected to a routine pat search by a male officer while exiting the dining hall along with the other Muslim women who had attended the meal after the Ramadan evening meal.[29]

29. This 2007 Ramadan meal pat search was conducted by a male officer in the presence of a female staff member.[30]

30. On February 27, 2008, Ms. Forde was pat-searched by a male officer in the presence of a female staff member, after Ms. Forde requested that a woman conduct the search.[31]

31. Also in 2008, Ms. Forde was pat searched by male officers in the presence of available

---

[25] Forde, Tr. Vol. 1, 12:4-5; 41:19-25; 44:9-14; 45:19-21; 58:10-13.
[26] Forde, Tr. Vol. 1, 13:14-24; 41:10-25; 42:17-21; 43:4-20.
[27] Forde, Tr. Vol. 1, 40:13-41:25; 43:4-16; 44:1-17.
[28] Forde, Tr. Vol. 1, 19-23; Ex. T.
[29] Forde, Tr. Vol. 1, 39:16-18; 40:13-41:18.
[30] Forde, Tr. Vol. 1, 41: 10-18.
[31] Forde, Tr. Vol. 1, 42:17-21.

female officers repeatedly within a span of 88 days, even after Ms. Forde spoke to the lieutenant in charge of the unit and asked that she be pat searched by available female staff instead.[32]

32. On November 8, 2004, Ms. Forde filed a Request for Administrative Remedy requesting that she be exempted from FCI Danbury's cross-gender pat search policy.[33]

33. On December 3, 2004, Warden William Willingham denied Ms. Forde's Request for Administrative Remedy, citing Program Statements concerning pat searches and identification photographs.[34]

34. Between December 3, 2004, and January 19, 2005, Ms. Forde appealed the Warden's decision regarding the Administrative Remedy to the BOP Northeast Regional Director.[35]

35. On January 19, 2005, Regional Director D. Scott Dodrill denied Ms. Forde's appeal.[36]

36. On February 8, 2005, Ms. Forde filed a Central Office Administrative Remedy Appeal to the National Inmate Appeals Administrator challenging the Regional Director's Response.[37]

37. On April 20, 2005, Administrator of National Inmate Appeals Harrell Watts denied Ms. Forde's appeal.[38]

*The Effect of an Individual Exemption on Employment and Security*

38. Since 1999, at least two inmates at FCI Danbury had been administratively exempted

---

[32] Forde, Tr. Vol. 1, 42:17-21; Ex. U.
[33] Forde, Tr. Vol. 1, 24; 27; Ex. N.
[34] Forde, Tr. Vol. 1, 28:21-25; 29-30; Ex. O.
[35] Forde, Tr. Vol. 1, 31-33; Ex. P.
[36] Forde, Tr. Vol. 1, 34:10-19; 35; Ex. Q.
[37] Forde, Tr. Vol. 1, 35:14-20; 36-37; Ex. R.
[38] Forde, Tr. Vol. 1, 38; Ex. S.

from routine pat searches by male staff.[39]

39. The Master Agreement between the officers' union and the BOP governing labor relations at FCI Danbury does not prohibit the granting of an individual exemption to cross-gender pat searches. [40]

40. Respondent has identified no negative impacts on prison security or employment at FCI Danbury resulting from these individual exemptions from routine cross-gender pat searches.[41]

41. Warden Zickefoose never considered revoking the existing individual exemptions from routine pat searches by male staff for security reasons.[42]

42. Granting Ms. Forde a similar individual exemption would have no noticeable effect on prison security or the orderly running of FCI Danbury.[43]

43. The FCI Danbury staff is approximately 66.67% male and 33.33% female.[44]

44. Female staff at FCI Danbury are stationed throughout the institution.[45]

45. The summoning of a female staff member to conduct a routine pat search would result in no harm to Respondent's security and employment interests.[46]

46. Correctional officers at FCI Danbury routinely carry hand-held radios. [47]

47. Correctional officers at FCI Danbury use these radios to communicate with each other.[48]

48. A male correctional officer can request a nearby female staff member to conduct a

---

[39] Miller, Tr. Vol. 1, 201:13-17; Zickefoose, Tr. Vol. 2, 181:11-20.
[40] Miller, Tr. Vol. 1, 167:10-18.
[41] Miller, Tr. Vol. 1, 202:1-18; Zickefoose, Tr. Vol. 2, 182:5-183:11.
[42] Zickefoose, Tr. Vol. 2, 182:21-183:11.
[43] Miller, Tr. Vol. 1, 203:13-16.
[44] Ex. M; Miller, Tr. Vol. 1, 162:12-14.
[45] Miller, Tr. Vol. 1, 170:2-12, 171:2-6; *see also* Forde, Tr. Vol. 1, 42:10-16.
[46] Miller, Tr. Vol. 1, 175:6-14; *see also* Forde, Tr. Vol. 1, 20:9-12.
[47] Miller, Tr. Vol. 1, 171:14-17.
[48] Miller, Tr. Vol. 1, 171:18-20.

routine pat search of a female inmate, or he can use his hand-held radio to call for a female staff member to conduct the pat search.[49]

49. The "vast majority" of pat searches at FCI Danbury are performed at predictable times and locations, such as after meals at the dining hall and at closing times in work areas.[50]

50. Walking from UNICOR to the dining hall at FCI Danbury takes no more than five minutes.[51]

51. A visual search, commonly called a strip search, is a visual inspection of all body surfaces.[52]

52. BOP policy requires that routine visual searches of female inmates be conducted by female staff.[53]

53. Respondent's male staff do not routinely perform visual searches of female inmates.[54]

54. Visual searches at FCI Danbury are regularly done in the receiving and discharge area of the facility and in SHU.[55]

55. Visual searches at FCI Danbury are also routinely done after all contact visits with inmates.[56]

56. Respondent's current policy of prohibiting routine cross-gender visual searches does not

---

[49] Miller, Tr. Vol. 1, 174:22-175:5; *see also* Zickefoose, Tr. Vol. 2, 179:7-180:2.
[50] Cantor, Tr. Vol. 2, 85:16-21; Miller, Tr. Vol. 1, 218:24-219:2; *see also*, Miller, Tr. Vol. 1, 140:14-141:1; Zickefoose, Tr. Vol. 2, 180:22-181-7; Forde, Tr. Vol. 1; 28:4-10.
[51] Miller, Tr. Vol. 1, 173:1-8.
[52] Miller, Tr. Vol. 1, 168:16-19; Zickefoose, Tr. Vol. 2, 185:4-14.
[53] Ex. J, at 3; Miller, Tr. Vol. 1, 169:17-19; Zickefoose, Tr. Vol. 2, 185:20-23; Cantor Tr. Vol. 2, 72-76.
[54] Ex. J, at 3; Miller, Tr. Vol. 1, 169:17-19; Zickefoose, Tr. Vol. 2, 185:20-23; Cantor Tr. Vol. 2, 72-76.
[55] Cantor, Tr. Vol. 2, 73:3-75:21; Zickefoose, Tr. Vol. 2, 185:24-186:3.
[56] Cantor, Tr. Vol. 2, 76:6-9; *see also* Zickefoose, Tr. Vol. 2, 185:24-186:3.

negatively impact the security or orderly running of FCI Danbury.[57]

57. Respondent is able to effectuate this policy without violating its employment obligations.[58]

58. Respondent's practice of permitting male staff to routinely pat search female inmates undermines the secure and orderly running of correctional institutions. Female inmates frequently accuse male staff of sexual misconduct, which requires an internal investigation and staff reassignment, draining institutional resources.[59]

59. Even unsubstantiated accusations of misconduct are disruptive to the institution, and negatively impact security.[60]

60. Many male staff do not conduct a complete and thorough search of female inmates because they are fearful of accusations of misconduct.[61]

61. The failure to conduct a complete and thorough pat search creates a risk of contraband trafficking and undermines institutional security.[62]

62. In September 2009, the U.S. Department of Justice Office of the Inspector General ("OIG") published a report titled, *The Department of Justice's Efforts to Prevent Staff Sexual Abuse of Federal Inmates* ("OIG Report").[63]

63. FCI Danbury was one of seven institutions visited as part of the report.[64]

64. The OIG Report states that, "BOP officials believed that male staff members were most

---

[57] Miller, Tr. Vol. 1, 169:20-170:1.
[58] Ex. K; Ex. 25; Zickefoose, Tr. Vol. 2, 186:12-190:11.
[59] Miller, Tr. Vol. 1, 191:4-18.
[60] Miller, Tr. Vol. 1, 191:19-192:5; Cantor, Tr. Vol. 2, 103:8-14.
[61] Miller, Tr. Vol. 1, 191:19-192:1.
[62] Miller, Tr. Vol. 1, 192:6-14.
[63] Ex. E.
[64] Ex. E, at 34.

often accused of sexual misconduct stemming from pat searches."[65]

65. Appendix I to the OIG Report lists 113 institutions that reported allegations of misconduct.[66]

66. According to the OIG Report, from 2001 to 2008, FCI Danbury had the fifth-highest number of allegations of staff sexual abuse of inmates among 113 BOP-managed institutions providing data.[67]

67. Significantly, FCI Danbury did not report allegations determined to be unfounded to the OIG, which means the total number of allegations (founded and unfounded) is likely to be higher.[68]

68. In June 2009, the National Prison Rape Elimination Commission ("PREA Commission") created by Congress released its final report and proposed standards regarding the prevention of sexual abuse in correctional settings.[69]

69. The PREA Commission's standards propose that cross-gender pat searches "be strictly limited in practice and only in the case of emergency or other extraordinary or unforeseen circumstances."[70]

70. The PREA Commission's report states that searches carried out by staff of the opposite gender heighten the potential for abuse.[71]

71. The prevailing practice in United States corrections is to prohibit routine pat searches of

---

[65] Ex. E, at 26.
[66] Ex. E, at 85-87.
[67] Ex. E, at 85; *see also* Zickefoose, Tr. Vol. 2, 208:8-209:1.  This may actually understate the number of allegations of staff sexual abuse at FCI Danbury.
[68] Ex. E, at 41.
[69] Ex. F.
[70] Ex. F.
[71] Ex. F.

female inmates by male staff.[72]

72. A 1999 survey by the National Institute for Corrections documented that only five states and the Federal Bureau of Prisons authorized pat searches of female inmates by male staff on a routine basis.[73]

73. Since 1999, three of those five states—Michigan, New Hampshire, and New York—have changed their policies to restrict pat searches of female inmates by male staff.[74]

74. Most prison systems in the United States maintain security without permitting male staff to routinely pat search female inmates.[75]

75. The BOP is "almost a lone holdout" among U.S. correctional systems in continuing to permit male staff to routinely pat search female inmates.[76]

### B. Proposed Conclusions of Law

*Religious Freedom and Restoration Act ("RFRA")*

1. RFRA guarantees a right to religious exercise that includes religious practices, regardless of whether they are mandatorily compelled by or central to a person's religion. 42 U.S.C. § 2000bb–1(a); 42 U.S.C. § 2000cc–5(7)(A).

2. RFRA prohibits Respondent from substantially burdening a person's exercise of religion even if the burden results from a rule of general applicability. 42 U.S.C. § 2000bb–1(a); *Jolly v. Coughlin*, 76 F.3d 468, 474-75 (2d Cir. 1996).

3. In order to establish a valid RFRA claim, Ms. Forde must first prove that "her right to the free exercise of religion has been substantially burdened."   42 U.S.C. § 2000bb-1(a);

---

[72] Ex. G; Miller, Tr. Vol. 1, 205-206.
[73] Ex. G.
[74] Exs. G, H, and AA; Miller, Tr. Vol. 1, 183:11-19; Cantor, Vol. 2, 87:8-11.
[75] Miller, Tr. Vol. 1, 190:9-23.
[76] Miller, Tr. Vol. 1, 205:16-206:3.

*Jolly*, 76 F.3d at 476.

4.  Demonstrating a substantial burden "is not a particularly onerous task." *McEachin v. McGuinnis*, 357 F.3d 197, 202 (2d Cir. 2004); *Singh v. Goord,* 520 F.Supp. 2d 487, 498-99 (S.D.N.Y. 2007).

5.  A substantial burden exists where the state puts substantial pressure on an adherent to modify her behavior and to violate her beliefs.  *Jolly* 76 F.3d at 477; *see also Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004); *Williams v. Bitner*, 359 F. Supp. 2d 370, 375-76 (M.D. Pa. 2005).

6.  A substantial burden exists where the state interferes with an adherent's religious observance. *McEachin,* 357 F.3d at 201, 202 n.4; *see also Nelson v. Miller,* 570 F.3d 868, 877-80 (7th Cir. 2009); *Love v. Reed,* 216 F.3d 682, 689 (8th Cir. 2000); *Makin v. Colorado Dept. of Corrections*, 83 F.3d 1205, 1213 (10th Cir. 1999).

7.  A substantial burden exists where the state "require[s] a believer to defile [her]self by doing something that is . . . forbidden by [her] religion." *Ashelman v. Wawrzaszek*, 111 F.3d 674, 677 (9th Cir. 1997); *see also Singh,* 520 F. Supp. 2d at 505; *Hayes v. Long*, 72 F.3d 70 (8th Cir. 1995).

8.  A substantial burden exists where an individual is forced by the government to choose between abandoning her religion and forfeiting benefits.  *Jolly*, 76 F.3d at 477 (quoting *Thomas v. Review Bd. of the Indiana Employment Sec. Div*., 450 U.S. 707, 718 (1981)).

9.  If a policy substantially burdens an inmate's religious exercise, RFRA requires that the burden be applied in furtherance of a compelling governmental interest. 42 U.S.C. § 2000bb–1(b)(1).

10. If a policy substantially burdens an inmate's religious exercise in furtherance of a

compelling governmental interest, RFRA requires that the burden be the least restrictive means of meeting that interest. 42 U.S.C. § 2000bb–1(b)(2).

11. Once an inmate shows a substantial burden on her religious exercise, RFRA establishes that the burden of proof then shifts to the government to demonstrate that the application of the substantial burden to the inmate furthers a compelling governmental interest and is the least restrictive means of furthering that compelling interest. 42 U.S.C. § 2000bb–1(b); *Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418, 430-31 (2006).

12. If a policy forces an inmate to violate her religious beliefs, RFRA requires that the imposition of the policy on the inmate be the least restrictive means of furthering a compelling interest, even if the inmate retains the ability to exercise other aspects of her religion in other contexts. *See Greene v. Solano County Jail*, 513 F.3d 982, 987 (9th Cir. 2008) (holding that, under RLUIPA, which applies same strict scrutiny test as RFRA, "the religious exercise at issue . . . is not [the] ability to practice [one's] religion as a whole" but the ability to practice "a particular facet of [one's] religious practice") (citing *San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024 (9th Cir. 2004)).

13. RFRA requires Respondent "to demonstrate that the compelling interest test is satisfied through application of the challenged law to…the [individual] claimant[.]" *O Centro Espirita*, 546 U.S. at 430-31. Courts applying the RFRA test are to "look[] beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *Id*. at 431.

14. Respondent's current policy of performing routine pat searches of female inmates by

male guards substantially burdens Ms. Forde's exercise of her religion.

15. Respondent's current pat search policy does not further any compelling governmental interest.

16. Even if the court were to find that the government was furthering a compelling government interest by applying its current pat search policy to Ms. Forde, the government has failed to establish that it is pursuing its interests through the least restrictive means.

17. Respondent's failure "to explain why []other institution[s] with the same compelling interests [are] able to accommodate the same religious practices [] constitute[s] a failure to establish that [Respondent] [is] using the least restrictive means" of furthering those interests. *Jova v. Smith*, 582 F.3d 410, 416 (2d Cir. 2009) (quoting *Warsoldier v. Woodford*, 418 F.3d 989, 1000 (9th Cir. 2005)).

18. Respondent's refusal to grant Ms. Forde an individual exemption from routine cross-gender pat searches violates RFRA.

19. An injunction should issue requiring Respondent to provide Ms. Forde with an exemption from routine cross-gender pat searches.

*First Amendment*

20. The First Amendment guarantees inmates a right to religious exercise. *Ford v. McGinnis*, 352 F.3d 582, 593 (2d Cir. 2004).

21. A burdened practice need not be mandated by an inmate's religion in order to sustain her free exercise claim. *McEachin v. McGinnis*, 357 F.3d 197, 203 (2d Cir. 2004).

22. Under Second Circuit jurisprudence, when considering a First Amendment claim, the court should examine whether the practice is religious in nature and whether the person's

religious belief is sincerely held; whether the challenged practice of prison officials impinge on this belief; and whether the challenged practice furthers some legitimate penological objective. *Ford*, 352 F.3d at 595.

23. In evaluating whether a challenged practice furthers a legitimate penological interest, courts consider a number of factors, including: whether a valid, rational connection exists between the regulation and the legitimate governmental interest stated for it; whether inmates have other open avenues to exercise the asserted right; the impact changing the practice would have on staff, other inmates, and allocation of prison resources; and whether there are reasonable alternatives the prison could adopt to accommodate the inmate's rights. *Turner v. Safley*, 482 U.S. 78, 89-90 (1987).

24. If a prison official's practice infringes upon an inmate's religious exercise, the First Amendment requires that a valid, rational connection exist between that practice and a legitimate government interest. *Ford,* 352 F.3d at 595; *see also Beerheide v. Suthers,* 286 F.3d 1179, 1189 (10th Cir. 2002) ("In order to warrant deference, prison officials *must present credible evidence* to support their stated penological goals.") (emphasis in original).

25. In assessing whether an inmate has other open avenues to exercise her asserted right under *Turner*, the relevant inquiry is whether she has alternative means of exercising the particular religious belief that she claims is being violated, not whether she has means of practicing other facets of her religion generally. *See Benjamin* v. *Coughlin*, 905 F.2d 571, 578 (2d Cir. 1990).

26. If an inmate claimant can point to an accommodation of her rights that would impose only a *de minimis* cost to valid penological interests, a court may consider that

accommodation a reasonable alternative to the prison's challenged policy. *Covino v. Patrissi*, 967 F.2d 73, 78-79 (2d Cir. 1992).

27. Respondent's refusal to grant Ms. Forde an exemption from routine cross-gender pat searches burdens Ms. Forde's First Amendment right to religious exercise. *See Ward v. Walsh,* 1 F.3d 873, 878 (9th Cir. 1993) (stating that "to require a believer to defile himself, according to the believer's conscience, by doing something that is completely forbidden by the believer's religion" is an infringement of her First Amendment rights).

28. Respondent's refusal to grant Ms. Forde an exemption from routine cross-gender pat searches does not further a legitimate penological interest.

29. There is no valid, rational connection between Respondent's refusal to grant Ms. Forde an exemption from routine cross-gender pat searches and any legitimate government interest.

30. Respondent's refusal to grant Ms. Forde an exemption from routine cross gender pat-searches due to her sincerely held religious beliefs violates the First Amendment.

31. An injunction should issue requiring Respondent to grant Ms. Forde an exemption from routine cross-gender pat searches.

## *No Legal Bar to Individual Exemption from Routine Pat Searches by Male Staff*

32. The Federal Labor Relations Authority has held that a non-arbitrary decision to assign female employees to a particular post is not a violation of the BOP's Master Agreement with the Council of Prison Locals, even if a male employee with seniority has requested that post. *American Federation of Government Employees Local 3584 (Union) and U.S. DOJ Federal BOP FCI Dublin, Calif. (agency)*, 58 F.L.R.A. 473 (2003).

33. Even if granting Ms. Forde an exemption from cross-gender pat searches would require

Respondent to reassign female employees to certain shifts and/or work assignments, this would not violate the BOP's Master Agreement.

34. An exemption from routine pat searches by men that required Respondent to reassign female employees to certain shifts and/or work assignments would not violate Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e *et seq*.

35. In the prison context, an employer's reasonable gender-based job assignment policy will be upheld if it imposes only a "minimal restriction" on employees. *Timm v. Gunter*, 917 F.2d 1093, 1102 n.13 (8th Cir. 1990), *cert. denied*, 501 U.S. 1209 (1991).

36. Gender-based assignment of shifts, even where it prevents corrections staff from selecting preferred assignments, is a "minimal restriction." *Tipler v. Douglas County*, 482 F.3d 1023, 1027 (8th Cir. 2007); *Robino v. Iranon*, 145 F.3d 1109, 1110 (9th Cir. 1998); *Tharp v. Iowa Dep't of Corrections*, 68 F.3d 223, 226 (8th Cir. 1995), *cert. denied,* 517 U.S. 1135 (1996).

37. An individual exemption from routine pat searches by men would not violate either federal labor law or the terms of the Master Agreement.

Respectfully Submitted,


_____/s/_____
Brett Dignam, ct00283


_____/s/_____
Sarah French Russell, ct26604


_____/s/_____
Scott L. Shuchart, ct27991

Jerome N. Frank Legal Services Organization
P.O. Box 209090
New Haven, CT 06520-9090
(203) 432-4800 phone
(203) 432-1426 fax
brett.dignam@yale.edu
sarah.russell@yale.edu
scott.shuchart@yale.edu
*Counsel for Petitioner.*

On the Proposed Findings of Fact and Conclusions of Law:
Megan Quattlebaum
Robert Silverman
Avi Springer
Adrienna Wong
Law Student Interns

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of these Proposed Findings of Fact and Conclusions of Law was e-filed this 19th day of February, 2010, with electronic notification sent to:

Assistant U.S. Attorney Alan Soloway
U.S. Attorney's Office – New Haven
157 Church St., 23rd floor
New Haven, CT 06510

Assistant U.S. Attorney Michelle McConaghy
U.S. Attorney's Office – New Haven
157 Church St., 23rd floor
New Haven, CT 06510


_____/s/_____
Brett Dignam
Jerome N. Frank Legal Services Organization
Yale Law School
P.O. Box 209090
New Haven, CT 06520
Bar No.: ct00283
brett.dignam@yale.edu